**Walter W. WILSON, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**Robert F. BERNSTOCK and Mitchell P. Goldstein, Defendants.**

**No. CIV.A. 01–0272(JEI).**

United States District Court, D. New Jersey.

Jan. 29, 2002.

Berger & Montague, P.C. by Todd S. Collins, Jacob A. Goldberg, Philadelphia, PA, Stull Stull & Brody by Jules Brody, Mark Levine, New York City, for Plaintiffs.

Kantrowitz, Goldhamer & Graifman by Gary S. Graifman, Montvale, Pepper Hamilton LLP by Cynthia N. Graham, Cherry Hill, Pepper Hamilton LLP by Barbara W. Mather, Gay Parks Rainville, Philadelphia, PA, for Defendants.

## AMENDED OPINION

IRENAS, District Judge.

Plaintiff Walter Wilson filed the instant lawsuit as a putative class action, seeking damages for alleged violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b–5, and Section 20(a) of the Exchange Act ("control person liability"). Plaintiffs are representatives of a class consisting of all persons who purchased the common stock of Vlasic Foods International, Inc. ("Vlasic"), on the open market from February 24, 1999 through February 10, 2000, inclusive ("class period").

Plaintiffs' original complaint named as defendants Vlasic and two individual defendants, Robert F. Bernstock, Vlasic's former President and Chief Executive Officer, and Mitchell P. Goldstein, former Vice President and Chief Financial Officer of Vlasic. Vlasic filed a petition for bankruptcy on January 29, 2001, and, on February 14, 2001, the Court administratively terminated this action as to Vlasic, but permitted the litigation to proceed as to the two individual corporate defendants.

Plaintiffs subsequently filed an Amended Class Action Complaint ("Amended Complaint") incorporating additional facts and statements obtained during the investigation by its counsel. Presently before the Court is Defendants' motion to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litiga-

tion Reform Act of 1995, 15 U.S.C. § 78u–4(b) ("PSLRA" or "Reform Act"). For the reasons set forth below, the Court concludes that Plaintiffs' Amended Complaint fails to meet the heightened pleading requirements of the PSLRA and therefore will be dismissed.

## I.

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, the court will accept as true all of the factual allegations contained in the complaint and any reasonable inferences that can be drawn therefrom. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). Dismissal of claims under 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Although the court must assume as true all facts alleged, "[i]t is not ... proper to assume that the [plaintiff] can prove any facts that is has not alleged." *Associated General Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Finally, when "confronted with a [12(b)(6)] motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania v. PepsiCo., Inc.*, 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

Generally, in reviewing the legal sufficiency of a complaint, a court may not consider material beyond the pleadings without converting the motion to dismiss into a motion for summary judgment. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997). The Third Circuit, however, has recognized certain exceptions to this general rule relevant to this Court's resolution of Defendants' motion to dismiss. For instance, a " 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.' " *Id.* at 1410 (quoting *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996)); *see also, Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.* 998 F.2d 1192, 1196–1197 (3d Cir.1993) ("When a complaint relies on a document ... the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute the evidence is greatly diminished."); *In re NAHC, Inc. Securities Litigation*, 2001 WL 1241007 at * 5 (E.D.Pa. Oct. 17, 2001). Accordingly, when an Amended Complaint contains excerpts from certain press releases, public announcements, or publicly filed disclosure documents, a court may properly refer to the full text of those public statements. *See In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 292 (3d Cir.1999) (Nygaard, Circuit J., concurring and dissenting) (citing *Burlington Coat*, 114 F.3d at 1426 and *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir.1996)). Additionally, in ruling on a motion to dismiss, the court also may consider certain matters of public record. *See id.* (citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, Inc. 998 F.2d 1192, 1196 (3d Cir.1993)). For instance, Courts of Appeals for the Second and Fifth Circuits permit a district court to take judicial notice of all public disclosure documents which are either required to be filed with the SEC or are actually filed with the SEC. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996). Decisions of the Third Circuit also support taking judicial notice of such mandated and/or duly filed SEC forms or notices. *See Oran v. Staf-*

*ford,* 226 F.3d 275, 289 (3d Cir.2000) (taking judicial notice of information contained in Forms 4 and 5 and Form 14A Proxy statements filed with the SEC); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 540 (3d Cir.1999) (citing information contained in Form 4 annexed to motion to dismiss).

## II.

Section 10(b) and Rule 10b–5 address "false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997). Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe ...." 15 U.S.C. § 78j(b). Rule 10b–5, in turn, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b).

In order to state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead that: (1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading[1]; (2) with scienter[2]; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the

plaintiff's reliance was the proximate cause of its injury. *See EP MedSystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 871 (3d Cir. 2000) (citing *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997)); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 537 (3d Cir.1999) (citing *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 710 (3d Cir.1996)).

Because claims brought under Section 10(b) and Rule 10b–5 are "fraud" claims, a plaintiff alleging such "false or misleading statements or omissions of material fact" must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." The purpose of this heightened pleading standard for allegations of fraud is to give "defendants notice of the claims against them, [provide] an increased measure of protection for their reputations, and reduce the number of frivolous lawsuit brought solely to extract settlements." *Burlington Coat,* 114 F.3d at 1418.

Allegations of securities fraud also must satisfy the specific pleading requirements of the PSLRA, 15 U.S.C. § 78u–4 et seq. The PSLRA both supplements and supersedes Rule 9(b) by imposing additional, heightened pleading requirements on claims alleging securities fraud. *See Advanta,* 180 F.3d at 530. By establishing a "uniform and stringent pleading" standard, Congress intended this reform legislation to resolve inconsis-

---

1. To be actionable, a misrepresentation or omission must be material. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Material information is defined as "information that would be important to a reasonable investor in making his or her investment decisions." *In re*

*Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425 (3d Cir.1997).

2. Scienter is defined generally as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

tencies among the circuits as to the appropriate pleading standard and to provide added protection against what was perceived as a growing number of frivolous "strike suits" aimed at achieving quick settlements. *See* S.Rep. No. 104–98, at 15 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694; *Advanta,* 180 F.3d at 531; *see also, In re CDNOW, Inc. Securities Litig.,* 138 F.Supp.2d 624, 639 ("While the PSLRA does not resolve the tension between deterring securities fraud and stymieing meritless suits, it was designed to favor the second consideration.").[3] Under the PSLRA, a complaint alleging violations of Section 10(b) and Rule 10b–5 must: (1) specify each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading and, (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed. *Klein v. Gen. Nutrition Cos.,* 186 F.3d 338, 344 (3d Cir.1999) (citing 15 U.S.C. § 78u–4(b)(1)).

In addition, under the Reform Act, the complaint must "state *with particularity* facts giving rise to a *strong* inference that the defendant acted with" scienter. *See* 15 U.S.C. § 78u–4(b)(2) (emphasis added). As the Third Circuit has noted, in Rule 10b–5 actions, this requirement supersedes the provisions of Rule 9(b) to the extent that rule would otherwise permit state of mind to averred generally. *Advanta,* 180 F.3d at 531 n. 5.[4] If a complaint fails to comply with the specific pleading requirements of the

PSLRA, dismissal of the complaint is statutorily mandated. 15 U.S.C. § 78u–4(b)(3)(A).

### III.

### A.

For purposes of this Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true the facts as alleged in Plaintiffs' Amended Class Action Complaint and any reasonable inferences which can be drawn therefrom. *See Nami,* 82 F.3d 63, 65 (3d Cir.1996). The following recitation of the facts therefore draws from Plaintiffs' complaint and does not represent findings of fact by the Court.

In a September 9, 1997 press release, Campbell Soup Company announced its plans to initiate a management-led spin-off of an array of Campbell's non-core business units, including Vlasic brand pickles and condiments and Swanson brand frozen foods. (Amend. Compl. at ¶ 36) The company subsequently announced in a February 26, 1998 press release that its Board of Directors had formally approved the spin-off of what would become Vlasic Foods International, Inc. (*Id.* at ¶ 38). Vlasic filed its Form 10–12B with the Securities Exchange Commission ("SEC") on March 5, 1998, registering its securities pursuant to Section 12(b) of the Securities Act of 1933. According to the Form 10–12B, the Campbell Board of Directors had decided to approve the spin-off "to enable the management of each of Campbell and Vlasic to focus on the operational strategies appropriate for its businesses so that each can

---

3. The underlying purposes of the Reform Act "was to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in the stock price, regardless of the defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipu-

lation of clients by class action attorneys." *Advanta,* 180 F.3d at 531.

4. While Fed.R.Civ.P. 9(b) requires that allegations of fraud or mistake be plead "with particularity," the rule ordinarily allows "malice, intent, knowledge, and other condition of mind of a person" to be "averred generally."

accelerate growth, decrease overall costs and maximize wealth for its shareholders." (*Id.* at ¶ 40). Defendant Robert Bernstock, a long-time, high-level business executive at Campbell who was slated to become the Chief Executive Officer of the new spin-off, touted Vlasic's prospects for future growth:

> Vlasic Foods International starts public life with an incredibly strong portfolio of businesses, having icon brand names such as Swanson, Vlasic, Freshbake and Swift. Moreover, nearly three quarters of our sales come from businesses in which we occupy the number one market share position, representing a wonderful and continuing consumer vote of confidence. Our brand and market positions are a superb foundation for building a lean, growth-oriented company, committed to delivering superior earnings performance and to seeking superior shareholder returns.

(*Id.* at ¶ 45). Vlasic was poised to become an independent manufacturer and marketer of "high quality, branded convenience food products," showing pro forma revenues of $1.5 billion for fiscal 1997 and $732 million for the first six months of fiscal 1998. Pro forma earnings for those periods were $50.6 and $21.2 million respectively. (*Id.* at ¶ 40).

When Vlasic's spin-off from Campbell became effective on March 30, 1998, Defendant Bernstock became the newly formed company's President and Chief Executive Officer, a position which he re-tained throughout the relevant class period. (*Id.* at ¶ 21) [5] Following the spin-off, Defendant Mitchell Goldstein joined Vlasic as the company's Vice President of Strategic Planning and Corporate Development and was eventually promoted to Vice President and CFO, a position left vacant by the resignation of William R. Lewis in the autumn of 1998. (*Id.* at ¶ 69).[6]

Despite the strength of its portfolio, the fledgling company faced several challenges in making the transition from a disparate band of subsidiaries into a unified, independent company. On February 20, 1998, just prior to announcing that its Board of Directors had formally approved the spin-off, Campbell entered into an agreement with various creditors which ultimately burdened Vlasic with a significant amount of debt. Campbell, Vlasic, and various banks, including Chase Manhattan Bank and Morgan Guaranty Trust Co. of New York, entered into a five-year revolving credit facility in the amount of $750 million. (*Id.* at ¶ 39). Under the terms of the Credit Facility, Campbell was entitled to borrow up to $500 million from this line of credit for its own uses. (*Id.*)[7] Upon Vlasic's separation from Campbell, Vlasic assumed all of Campbell's obligations to repay these borrowed funds, releasing Campbell from any further obligation. (*Id.*) As with any lending agreement, the Credit Facility contained various debt covenants requiring, among other things, that Vlasic meet certain financial ratios and provide accurate and reliable financial re-

---

**5.** Prior to becoming Vlasic's President and CEO, Defendant Bernstock was President of Campbell's U.S. Grocery division. (Amend. Compl. at ¶ 21).

**6.** Defendant Goldstein was formerly the head of Strategic Planning for the Specialty Foods division of Campbell. (Amend. Compl. at ¶ 22).

**7.** According to Plaintiffs' Amended Complaint, Campbell did, in fact, borrow $500 million against the Credit Facility, leaving Vlasic to begin its operations as an independent business entity with a significant amount of debt. (Amend. Compl. at ¶ 49). In addition, while Vlasic was then, in theory, "entitled to draw upon the remaining $250 million to satisfy its capital needs, it would be forced to use the first $58.7 million of that amount to satisfy inter-company payables representing advances by Campbell's [sic] to various Vlasic subsidiaries." (*Id.*).

ports to the lenders on a timely basis. (*Id.* at ¶ 50) [8]

In addition to assuming a heavy debt load, Vlasic began its operations with no independent administrative facilities—buildings, electricity, telephones, computers, record-keeping programs and software, etc.—and essentially had to build all the necessary infrastructure from scratch. In order to assist the newly formed company in building this infrastructure, Campbell and Vlasic entered into a Transition Services Agreement ("TSA") pursuant to which Campbell agreed to provide transitional administrative and support services to Vlasic. (*Id.* at ¶ 43). By its terms, this contractual arrangement was scheduled to expire on March 29, 1999, providing Vlasic with twelve months within which to purchase and develop its own independent administrative facilities and computer systems. (*Id.*).

Despite optimistic forecasts and the ambitious goals of the company's senior executives, the performance and growth of the company failed to live up to the expectations of investors and the company's executives. On May 21, 1998, Vlasic issued a press release announcing that its earnings for the third and fourth quarters of fiscal 1998, ending May 3 and August 2, 1999 respectively, would fall short of analysts' expectations. (*Id.* at ¶ 52).[9] Vlasic's disappointing performance was attributed, in part, to the company's efforts to "align shipments with consumption" in order to more accurately reflect the actual sales of its products, even though it meant sacrificing short-term gains in earnings. (*Id.* at ¶ 52). According to Plaintiffs' Amended Complaint, these corrective measures were necessary in order to eliminate the lingering effects of Campbell's aggressive pre-spin-off discounting and sales practices. (*Id.* at ¶ 58). These alleged sales practices, referred to as "trade loading," involved offering unusually large discounts to Campbell's customers in exchange for advance purchases of Campbell's products in order to artificially boost reported quarterly sales and earnings. (*Id.* at ¶ 59). These practices, which are the subject of private securities fraud litigation currently pending before this court, caused excess inventory of Vlasic products to exist throughout Vlasic's network of customers. (*Id.* at ¶ 58).[10] While inflating Campbell's reported pre-spin-off sales and earnings, these "trade loading" practices had an adverse affect on Vlasic's sales in the second half of fiscal 1998. (*Id.* at ¶ 58).[11] Accord-

---

**8.** Under the terms of the Credit Facility, failure to comply with these debt covenants could result in Vlasic's creditors demanding accelerated repayment of its outstanding debt obligations. (Amend. Compl. at ¶ 51).

**9.** On May 27, 1998, Vlasic issued a press release reporting its actual earnings for the third quarter of fiscal 1998, ending on May 3, 1998. The company reported pro forma diluted earnings of $0.10 per share excluding restructuring, one-time, and transition charges. Including these charges, Vlasic suffered a loss of $0.56 per share. Sales were down 10% to $320 million from the same period in fiscal 1997, "driven equally by both a reduction of retail inventories and by reduced consumption, linked to a lack of product innovation and lack of advertising support." (Amend. Compl. at ¶ 54).

**10.** Campbell's alleged aggressive trade loading practices are the subject of a suit currently pending before this court. *See In re Campbell Soup Securities Litigation*, 145 F.Supp.2d 574 (D.N.J.2001) (Irenas, J.). Plaintiffs in this litigation do not allege that either Defendants Bernstock and Goldstein or Vlasic Foods International, Inc. engaged in similar "trade loading" practices in order to artificially boost reported sales and earnings.

**11.** As a result of Campbell's alleged "trade loading" practices, retail customers of Campbell products, including Vlasic brand pickles and condiments and Swanson brand frozen foods, would buy more product than they would consume, and would therefore purchase less product in later quarters.

ing to Plaintiffs, Campbell's sales practices also resulted in the accumulation of a large balance of unresolved trade expenses and customer deductions which Campbell had promised to Vlasic customers in exchange for purchasing Vlasic products those customers did not need. (*Id.* at ¶¶ 60–62).

Vlasic also experienced difficulty complying with the debt covenants contained in the $750 million Credit Facility. In its Quarterly Report on Form 10–Q for the period ended May 3, 1998, Vlasic informed investors that, "as a result of accelerated and higher than anticipated transition charges and lower than anticipated earnings," it did not expect to be in compliance with financial ratio requirements of its lending agreements as of the fiscal year ending August 2, 1998. (*Id.* at ¶ 66).[12] Following negotiations with its creditors, Vlasic was able to avoid default by entering into an Amended and Restated Credit Agreement which eased the financial ratio requirements, but increased the interest rate and fees. (*Id.* at ¶ 67).[13]

Defendants sought to reassure investors and its shareholders that they remained confident about Vlasic's growth potential despite the company's disappointing performance during the transition period, expressing their continued optimism in the May 27, 1998 press release:

Fiscal 1998 is a transition year on our road to becoming a truly great food company. We are now even more confident of delivering our fiscal 1999 financial goals which have never changed. We have made conscious decisions to do the right things in the short-term, such as investing in brand building and aligning shipments with consumption, because they are necessary for the long-term health and growth of the business.

(*Id.* at ¶ 56). In the same press release, Vlasic also informed investors that it was "ahead of schedule in the development of its independent infrastructure, including the implementation of a state-of-the-art MIS [Management Information System] system." (*Id.* at ¶ 55).

Vlasic, however, continued to report declining sales and disappointing earnings. On November 30, 1998, the company issued a press release announcing sales of $327 million for the first quarter of fiscal 1999 (ended November 1, 1998), down from $348 million in the same quarter of fiscal 1998. Earnings per share were $0.10. (*Id.* at ¶ 70). Commenting on these results, Defendant Bernstock continued to reassure investors about the Company's potential for growth, focusing in part on the benefits which the company's investment in its new infrastructure were

---

12. The relevant excerpt from Vlasic's quarterly report read as follows:
    As of May, 3, 1998, the Company was in compliance with these [debt] covenants. As a result of accelerated and higher than anticipated transition charges and lower than anticipated earnings, it is expected that Vlasic will not be in compliance with the financial ratio requirements of the fiscal year ending August 2, 1998 which could allow the banks to demand repayment of the debt. The Company is currently in discussions with its lenders to renegotiate the financial ration requirements of the credit facility and is confident the agreements will be amended during the fourth quarter of fiscal

1998 so that the Company will be in compliance with amended financial ratio requirements, although no assurances can be given. Although the amended terms are expected to result in a higher interest rate, the Company does not believe they will have a material impact on its results of operations, financial position or cash flows. (Amend. Compl. at ¶ 66).

13. A copy of the Amended and Restated Credit Agreement, dated September 30, 1998, was annexed to Vlasic's Annual Report on Form 10–K for the fiscal year ended August 2, 1998, filed with the SEC on October 20, 1998. (Amend. Compl. at ¶ 67).

expected to yield following the transition period:

Our capabilities across our entire infrastructure, including information technology, sales, and research and development, should be as good as, if not better than those of the large-cap food companies. We will use these capabilities for competitive advantage. Our investments in these areas—as well as in our brands—are beginning to pay-off now and are expected to continue even more so in the future.

(*Id.* at ¶ 70). It was, thus, expected that, following the one-year transition period, Vlasic's newly purchased MIS systems would contribute to the company's future growth potential.

As part of its plan for achieving full independence from Campbell prior to the expiration of the TSA on March 29, 1999, Vlasic purchased and proceeded to implement a new MIS systems designed, in part, to perform various financial reporting functions previously provided by Campbell's information systems. Vlasic purchased and proceeded to implement a state-of-the-art computer network, Business Process Control System ("BPCS"), for use in its financial reporting functions. For use in the processing, tracking, and analyzing trade deductions, Vlasic selected Gelco Trade Management Solution ("Gelco TMS"), a web-based system offering funds and deduction management and spending analysis. (*Id.* at ¶¶ 75–76). In theory, this system was designed to provide a single integrated system for accurately identifying, managing, and resolving customer deductions that worked across Vlasic's entire business and was compatible with Vlasic's existing internal systems. (*Id.* at ¶¶ 76–80).

While it is unclear from the Amended Complaint precisely when implementation of these systems began, in Vlasic's Form 10-Q (for the period ending November 1,

1998), filed with the SEC on December 15, 1998, the company reported that "implementation of newly purchased systems is targeted for completion from April 2, 1999 and is approximately 70% complete." (*Id.* at ¶ 72). Vlasic subsequently made the following announcement in a press release issued on Feb. 24, 1999:

It has been only 10 months since we became a separate, independent company and in that short amount of time we've completed building our infrastructure for the future growth of the Company.... "As of February 1, 1999 we're operating with our new state-of-the-art IT system which includes our own Customer Services and Business Service Centers."

(*Id.* at ¶ 82). In its next Form 10-Q, for the Third Quarter, ending on May 2, 1999, Vlasic provided the following update:

We have established a new corporate infrastructure to operate on a stand-alone basis, and as of April 1999 we have substantially completed all of the operating and management systems and capabilities necessary to handle internally the services that had previously been provided by Campbell.

(*Id.* at ¶ 10). However, in a press release issued on February 10, 2000, Vlasic reported that previous financial statements had underestimated the amount of outstanding customer deductions and trade marketing expenses and would have to take $14.5 million as an additional charge against earnings for the second quarter of the fiscal year 2000. The Company noted that the charge accounted for approximately $.20 out of the $.32 per share loss for the quarter:

... [a]dditional charges from trade marketing and customer deductions, related primarily to fiscal 1999 and earlier, contributed to $0.20 per share to the expected second quarter loss. *These*

*charges resulted primarily from revised estimates based on new information that provided better estimates and insight to the Company following conversion to new billing and trade marketing systems and processes after the conclusion of Vlasic's transition service agreement with Campbell Soup.* The company is conducting a review of these systems and is continuing to implement processes and procedures to properly capture and analyze trade marketing spending and customer deductions.

(*Id.* at ¶ 98). In the same press release, Vlasic also announced that "the Company [had] previously received from its lenders a waiver of certain covenants of its senior credit facility until February 29, 2000 and is currently in discussions with its lenders to extend the waiver period. Management will also be working toward having an amended senior credit agreement, although no assurances can be given that the amendment will be completed." (*Id.* at ¶ 99). On March 15, 2000, Vlasic filed its Second Quarter Form 10–Q for the quarter ending January 30, 2000. This form reported a three-month loss of $21.7 million, including "charges of approximately $14.5 million incurred in the second quarter of fiscal 2000 for trade marketing and customer deductions resulting from revised estimates, *principally for 1999 and earlier,* based on new information following [the company's] conversion to new billing and trade marketing systems and processes." (emphasis added). The Company also provided an update on its negotiations with its creditors and the waiver of certain debt covenants:

> On January 18, 2000, we received a waiver from the senior credit facility bank syndicate for the debt/EBITDA ration and fixed charge coverage ration through February 29, 2000. Effective February 29, 2000, we received a further waiver from the senior credit facility bank syndicate covering the debt/EBIT-

DA ratio and the fixed charge coverage ration of the facility through June 20, 2000. This waiver required the payment of a fee, and increase in interest rates, delivery and compliance with a cash budget, and also established a minimum EBITDA test. If the minimum EBITDA test is not met as of the end of the third quarter fiscal 2000, the waiver period will end on May 31, 2000 ... The waiver also required that the senior credit facility be secured by liens on substantially all U.S. owned real property on or before April 20, 2000. We fully expect to be in compliance with the minimum EBITDA test and the terms and conditions set forth in the waiver for the third quarter fiscal 2000.

(*Id.* at ¶ 102). Thereafter, on April 28, 2000, Vlasic filed a Form 10–K/A for the year ending August 1, 1999, amending its 1999 10–K, disclosing its status as a going concern. (*Id.* at 103). The amended 1999 10–K also contained an amended certificate from Vlasic's outside auditors, PricewaterhouseCoopers, which expressed "substantial doubt about [Vlasic's] ability to continue as a going concern due to Vlasic's inability to maintain compliance with certain financial ratios under its bank agreements." (*Id.* at 106).

### B.

Against this background, Plaintiffs allege that the following statements contain false or misleading representations or omissions:

### 1. *The February 24, 1999 press release*

On February 24, 1999, Defendants caused Vlasic to issue a press release announcing its results for the second quarter of fiscal 1999, ended January 31, 1999. The company reported earnings, excluding "one-time" items associated with the spin-off, of $10.8 million or $0.24 per share. (Amend. Compl. at ¶ 82). Vlasic further

reported net sales of $356,625,000 for the quarter and marketing and selling expenses of $61,635,000. (*Id.*). Commenting on these results, Defendant Bernstock noted the company's successful completion of the infrastructure necessary to achieve Vlasic's transformation into a separate, self-sufficient business entity:

It has been only 10 months since we became a separate, independent company and in that short amount of time we've completed building our infrastructure for the future growth of the Company. ... *"As of February 1, 1999 we're operating with our new state-of-the-art 1T system* which includes our own Customer Services and Business Service Centers. We've done all this and more as we have invested in the long-term growth of our core 'Vlasic' and 'Swanson' businesses."

(Id. at ¶ 83) (emphasis in original).

2. *Vlasic's Second and Third Quarter 1999 Form 10–Q (filed on March 16, 1999 and June 8, 1999, respectively) and First Quarter 2000 Form 10–Q (filed on December 10, 1999):*

Subsequently, on March 16, 1999, Vlasic filed its Quarterly Report on Form 10–Q for the Second Quarter of fiscal 1999 (ending January 31, 1999) with the SEC. In addition to repeating the financial results Vlasic had issued in the February 24, 1999 press release, the Second Quarter 10–Q represented that those results had been prepared in accordance with generally accepted accounting principles ("GAAP") and that any adjustments necessary for a fair presentation of the consolidated financial statements had been included:

The accompanying unaudited consolidated financial statements for the three and six month periods ended January 31, 1999 and February 1, 1998 have been *prepared in accordance with generally accepted accounting principles for interim financial information.* Accordingly,

they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. *In our opinion, all adjustments* (consisting solely of normal recurring adjustments) *necessary for a fair presentation of the consolidated financial statements have been included.*

(Amend. Compl. at ¶ 85) (emphasis in original). The Second Quarter 1999 10–Q also set forth Vlasic's Consolidated Statement of Earnings and balance sheet for the second quarter, which, among other things, reported pro forma net sales of $356,625,000, net earnings of $11,805,000, and total costs and expenses of $329,025,000. (*Id.* at 86). Vlasic's Third Quarter 1999 Form 10–Q and First Quarter 2000 Form 10–Q contain language identical to that italicized above and similarly report financial information regarding Vlasic's quarterly net earnings and total costs and expenses. (*Id.* at ¶¶ 89, 97). The Third Quarter 1999 Form 10–Q, filed on June 8, 1999, reports a pro forma net loss of $140,128,000 and total costs and expenses of $437,869,000. (*Id.* at ¶ 90). Vlasic's First Quarter 2000 Form 10–Q, filed on December 10, 1999, reports pro forma net sales of $264,404,000, net earnings of $4,109,000, and total expenses of $246,121,000. (*Id.* at ¶ 95).

3. *Vlasic's annual 1999 Form 10–K (filed on October 15, 1999)*

On October 15, 1999, Vlasic filed its 1999 Form 10–K which set forth, among other things, a Consolidated Balance Sheet and Consolidated Statement of Earnings for the fiscal year ending August 1, 1999, reporting a net loss of $126,331,000 and total costs and expenses of $1,374,735,000. (*Id.* at ¶ 92). The 1999 Form 10–K also makes reference to the implementation and integration of Vlasic's new information systems in a section entitled Management's Discussion and Analysis, stating that "as *of*

*April 1999* we have substantially completed all of the operating and management systems and capabilities necessary to handle internally the services that had previously been provided by Campbell." (*Id.* at ¶ 93) (emphasis in original). Finally, the form included a "Report of Management", dated September 15, 1999, which makes the following representations regarding the company's financial statements:

> The accompanying financial statements have been prepared by our management in conformity with generally accepted accounting principles to reflect the financial position of Vlasic and our operating results. Financial information appearing throughout this Annual Report is consistent with that in the financial statements. Management is responsible for the information and representations in such financial statements. In order to meet its responsibility, *management maintains a system of internal controls designed to assure that assets are safeguarded and that financial records properly reflect all transactions.* We also maintain a worldwide auditing function to periodically evaluate the adequacy and effectiveness of such internal controls, as well as our administrative procedures and reporting practices.

(*Id.* at ¶ 94) (emphasis in original).

Plaintiffs maintain that each of the above statements contained materially false or misleading misrepresentations and omissions at the time they were made because "Defendants knew, or recklessly disregarded, [throughout the relevant class period beginning on February 24, 1999] that Gelco's TMS was not running sufficiently well, if at all, to capture material customer deductions relating to both Campbell's trade loading practices and to the ongoing operations of Vlasic" but failed to disclose these problems to investors. Consequently, Defendants caused the company to misrepresent the adequacy of its internal controls and to issue unreliable financial reports which materially understated Vlasic's marketing and selling expenses. (*Id.* at ¶ 87).[14]

## IV.

Defendants do not dispute that, at least in retrospect, the deficiencies in the Gelco system were material to the extent that they resulted in the significant underreporting of Vlasic's trade marketing expenses and customer deductions and the filing of financial reports which did not accurately reflect the company's earnings. Defendants maintain, however, that Plaintiffs' Amended Class Action Complaint fails to "plead *with particularity* facts sufficient to give rise to a *strong* inference of scienter," as required by the Private Securities Litigation Reform Act (PSLRA). 15 U.S.C. § 78u–4(b)(2) (emphasis added).[15]

14. Plaintiffs further allege that Vlasic's reported financial statements violated Generally Accepted Accounting Principles ("GAAP") "in that its internal controls were inadequate to address the weaknesses in the information technology systems which produced inaccurate financial information until, at the earliest, the second quarter of fiscal 2000 when the revisions resulting in additional charges of $14.5 million" were disclosed. (Amend. Compl. at ¶ 107). Specifically, Plaintiffs contend that Vlasic's financial statements during the class period violated the basic accounting concepts of reliability, completeness, and relevance. (*Id.* at ¶ 108).

15. The principal focus of the instant motion to dismiss concerns the legal sufficiency of Plaintiffs' allegations with regard to scienter. Defendants argue, in the alternative, however, that Plaintiffs' Amended Complaint should be dismissed for the separate and independent reason that it fails to adequately specify the circumstances of the alleged fraud and the underlying factual basis for statements made upon information and belief as required under Rule 9(b) and the PSLRA. Under both Rule 9(b) and the PSLRA, plaintiffs must provide the " 'who, what, when, where, and how: the first paragraph of any newspaper story.' " *Advanta,* 180 F.3d at 534 (quoting *DiLeo v.*

In determining the effect of the Reform Act on pre-PSLRA standards for pleading scienter, the Third Circuit has held that Congress's use of the Second Circuit's "strong inference" language in the text of the statute "compels the conclusion that the Reform Act establishes a pleading standard approximately equal in stringency to that of the Second Circuit." *See In re Advanta, Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir.1999). The Third Circuit's pre-PRLSA standards for pleading scienter did not differ materially from that of the Second Circuit. Accordingly, in evaluating the sufficiency of Plaintiffs' allegations of scienter, the Court will draw primarily from the case law of both jurisdictions.

■■■ In the Third Circuit, a plaintiff may establish the requisite strong inference of fraudulent intent in one of two ways: (1) "by alleging facts establishing a motive and an opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." *Advanta*, 180 F.3d at 534–35 (concluding that Reform Act did not "purport to alter the substantive contours of scienter" as articulated by the Second Circuit); *Burlington Coat*, 114 F.3d at 1418 (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995)) (adopting the pleading standard originally developed by the Second Circuit in *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987)). Be-

cause the Court concludes that the pleadings in Plaintiffs' Amended Class Action Complaint fail to set forth specific facts sufficient to support the requisite strong inference of scienter under either alternative form of pleading, Plaintiffs' complaint will be dismissed.

## A.

■■■ Under the motive and opportunity test, Plaintiffs must allege facts showing that each individual corporate defendant had the motive to commit fraud and a "clear opportunity" to do so. *See Burlington Coat*, 114 F.3d at 1418. Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures. *See Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir.1999); *In re Nice Systems, Ltd. Securities Litig.*, 135 F.Supp.2d 551 (D.N.J.2001). Opportunity refers to "the means and likely prospect of achieving such concrete benefits by the means alleged." *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir.2000) (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)).

Under the PSLRA, motive and opportunity "like all other allegations of scienter must now be supported by facts stated 'with particularity' and must give rise to a 'strong inference' of scienter." *Advanta*,

---

*Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). Moreover, under the PSLRA, if allegations regarding a particular statement or omission are made on information or belief, the complaint must state with particularity all facts on which the belief is formed. 15 U.S.C. § 78u–4(b)(1). Defendants argue that Plaintiffs have failed to plead with sufficient particularity "when" and "how" Defendants' knew or were reckless in not knowing about: (a) the alleged inability of the Gelco TMS system to capture and analyze trade spending infor-

mation and (b) that such information would show that trade spending had been more than Vlasic had estimated and accrued for the fiscal year 1999, as well as the specific facts on which these allegations are made. Because Defendants' arguments with respect to this issue bear directly on the question of whether Plaintiffs have alleged the requisite "state of mind" with a sufficient degree of specificity, the Court will address them in the context of its application of the PSLRA's standard for pleading scienter.

180 F.3d at 535 (quoting 15 U.S.C. § 78–4(b)(2)). As the Third Circuit has explained, the adoption of the Second Circuit's more stringent pleading requirements

> ... addressed the previous ease of alleging motive and opportunity on the part of corporate officers to commit securities fraud. Permitting blanket assertions of motive and opportunity to serve as the basis for liability under the Exchange Act would undermine the more rigorous pleading standard Congress has established. After the Reform Act, catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.

*Id.*

Consistent with the heightened pleading requirement now codified in the PSLRA, both the Second Circuit and Courts of Appeals in other jurisdictions have consistently rejected allegations of scienter based on generalized theories of motive which are widely held by corporations and their executives. The motive to artificially inflate a company's stock price in order to increase performance-based executive compensation or prolong the benefits of holding corporate office, for instance, is the type of generalized motive that can be imputed to the top executives of almost any publicly-owned, for-profit corporation and is therefore not a sufficient motive for fraud for purposes of inferring scienter. *See Novak*, 216 F.3d at 307; *see also In re Green Tree Financial Corp. Stock Litigation*, 270 F.3d 645, 659–60 (8th Cir.2001) *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1269 (10th Cir. 2001). Courts have similarly held that "a company's desire to maintain a high bond or credit rating" does not "qualify as a sufficient motive for fraud ... because if scienter could be pleaded on that basis

alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc.*, 75 F.3d 801, 814 (2d Cir.1996); *In re Green Tree*, 270 F.3d 645, 659–60; *City of Philadelphia*, 264 F.3d at 1269. A formulation of "motive and opportunity" under which such generalized theories of motive would suffice to plead scienter under the Reform Act would clearly subvert "Congress's stated intent of strengthening pleading requirements and deterring frivolous securities litigation." *Advanta*, 180 F.3d at 534.

■ Moreover, as the language of the PSLRA suggests, a securities fraud complaint, whether alleging motive and opportunity or conscious or reckless misconduct, cannot survive a motion to dismiss unless its pleadings collectively give rise to an inference of scienter which is both "reasonable," "rational," or "plausible" *and* strong. *See In re Green Tree*, 270 F.3d 645, 659–60; *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 194 (1st Cir.1999) (facts alleged must support a strong inference of scienter, rather than merely reasonable inference); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir.2001). Accordingly, in order to meet the PSLRA pleading standard based on allegations of "motive and opportunity" alone, specific facts plead in the complaint must show "an unusual, heightened motive," and not merely a "rational" or "plausible" motive to commit fraud shared by a significant majority of companies and corporate executives. *See In re Green Tree*, 270 F.3d 645, 659–60; *see also City of Philadelphia*, 264 F.3d at 1269 (dismissing alleged motives which "are shared by all companies and which are not specifically and uniquely related to [the defendant] in particular"); *Phillips*, 190 F.3d at 623 ("We are not called on to

decide whether defendants' actions demonstrate a theoretically possible motive. Rather, the PSLRA requires us to 'curtail the filing of meritless lawsuits' by allowing only those suits which demonstrate 'a strong inference' of scienter to survive a motion to dismiss."). Indeed, even complaints pleading motive based on insider trading must allege more than that a particular corporate insider sold stock during the relevant class period and thereby personally benefitted from the alleged false statements or misleading omissions. *See Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir.2000). In order to support an inference of fraudulent intent, the insider trades must be shown to have been "unusual" in either scope (i.e., the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved) or timing. *See id.* ("While we will not infer fraudulent intent from the mere fact that some officers sold stock, 'if the stock sales were unusual in scope or timing, they may support an inference of scienter.'") (quoting *Advanta*, 180 F.3d at 540); *Burlington*, 114 F.3d at 1423 (to support a strong inference of fraudulent intent based on insider trading, trading must occur at times and in quantities that were unusual or suspicious).

In their Amended Complaint, Plaintiffs posit that "Defendants had the *potential* to benefit from their conduct which inflated the price of Vlasic securities because their compensation was directly tied to the reported financial performance of Vlasic." (Amend. Compl. at ¶ 115(d)). As the Complaint explains, "the compensation of Vlasic's executives was heavily in options, many of which had been converted from Campbell options." (*Id.* at ¶¶ 3, 9). Moreover, both Bernstock and Goldstein were eligible for a bonus award for fiscal year 1999 "subject to a plan pursuant to which the principal factors in awarding such bonuses were corporate earnings per share and divisional earning before interest taxes, targets set at the beginning of the year and certain comparative rate of annual growth targets." (*Id.* at ¶¶ 21, 22). Given the nature of their executive compensation packages, Defendants "could not afford to allow the price of Vlasic's stock to fall too far, lest their options be and remain worthless." (*Id.* at ¶ 9). It is by now well-established that such allegations, standing alone, are clearly be insufficient to support a strong inference of intent to defraud. *See Shields*, 25 F.3d at 1130; *In re Green Tree*, 270 F.3d 645, 659–60 ("pleading that a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate earnings."); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068–69 (5th Cir.1994) ("It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent").

In their reply brief, however, Plaintiffs pull together various underlying facts plead in their Amended Complaint to construct a somewhat more elaborate theory of "motive." Plaintiffs draw a link between the Defendants' performance-based compensation and the difficulty experienced by Vlasic in complying with certain debt covenants contained in its lending agreements. Specifically, Plaintiffs allege that, following its separation from Campbell and throughout the relevant class period, Vlasic was saddled with a significant amount of debt and had experienced difficulty in complying with its debt covenants. These debt covenants required, among other things, that Vlasic maintain certain financial ratios tied to its earnings and provide its lenders with accurate financial statements. Because much of their personal wealth was tied up in Vlasic options, the consequences of default could potentially have a significant, adverse effect on

Defendants' executive compensation. Based on these underlying facts, Plaintiffs allege that Defendants had a motive to deliberately conceal or recklessly disregard the fact that material issues existed with regard to the Gelco system's ability to accurately track and capture trade deductions and permit Vlasic to overstate its earnings in order to maintain Vlasic's compliance with its debt covenants and "save a large portion of their personal wealth." (Pl.'s Br. Opp'n at 26).

Plaintiffs' "motive" theory is a slight variation on the types of generalized theories of motive that have routinely been rejected as insufficient to give rise to a strong inference of scienter. There is little substantive distinction between the desire to "preserve" one's performance-based executive compensation by satisfying creditors as to the financial soundness of the corporation and the alleged desire to enhance the value of one's executive compensation by artificially inflating the value of the company's stock. Incentive compensation in the form of stock options and performance-based bonuses is very common. *See Burlington,* 114 F.3d at 1424 (observing that "a large number of today's corporate executives are compensated in terms of stock and stock options"). Indeed, one of the purposes for this type of compensation arrangement is to link executives' own personal financial success to that of the company they are charged with operating so as to create an added incentive for top business managers to prudently manage the company's business and maximize the value of shareholders' investment. For this reason, courts have uniformly held that incentive compensation alone cannot provide a sufficient basis on which to support allegations of a motive to create the illusion of corporate profitability, whether by active misrepresentation or wrongful nondisclosure of materially adverse information. *See, e.g., Shields,* 25 F.3d at 1130 ("Incentive compensation can hardly be

the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations."); *In re Party City Sec. Litig.,* 147 F.Supp.2d 282, 314 (D.N.J.2001).

Courts have similarly regarded the alleged desire to maintain a high bond or credit rating or to represent to creditors that the corporation remains capable of meeting its debt obligations as the type of shared business motives that are insufficient, by themselves, to support an inference of intent to commit fraud. *See, e.g.,* In re Green Tree, 270 F.3d 645, 664 ("[t]he desire to maintain a high credit rating is universally held among corporations and their executives and consequently does not contribute significantly to an inference of scienter") (citing *Novak,* 216 F.3d at 307); *San Leandro,* 75 F.3d at 813 (finding that the alleged desire to pay less interest on debt by maintaining an artificially inflated credit rating does not state an actionable motive); *In re Party City,* 147 F.Supp.2d at 314 ("the desire to satisfy investors and lenders as to a company's financial soundness is insufficient, by itself, to demonstrate scienter" because "every public company seeks to satisfy its investors and lenders by demonstrating its financial soundness"). Indeed, a district court in the District of Maryland recently considered and rejected a theory of motive similar to that advanced by Plaintiffs. *See In re E.Spire Communications, Inc. Sec. Litig.,* 127 F.Supp.2d 734 (D.Md.2001). In E.*Spire,* the court held that the alleged desire to inflate corporate earnings in order to maintain compliance with debt covenants and avoid the potentially adverse consequences of default, like the desire to maintain a high bond or credit rating, is not alone qualify as a sufficient motive for fraud under the PSLRA:

Plaintiffs further argue that defendants had a motive to commit fraud in order to comply with e.spire's debt covenants. The Complaint alleges that e.spire had severe cash flow problems and that if it could not satisfy certain debt covenants within its $200 million Senior Secured Credit Facility, it would be unable to continue to borrow much needed funds to maintain its operations. However, a company's desire to maintain a high bond or credit rating does not qualify as a sufficient motive for fraud. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 814 (2d Cir. 1996). If scienter could be plead on that basis alone, virtually every company in the United States experiencing a down turn in the price of its stock would be forced to defend securities fraud actions. *Id.* (citing *Acito*, 47 F.3d at 54).

*Id.* at 744.

The Court finds Plaintiffs' theory of motive similarly insufficient to satisfy the Reform Act's pleading standard. The two general "motives" which Plaintiffs allege to have been operating in tandem here—the desire to "preserve" incentive compensation and the need to maintain compliance with debt covenants—too often coincide to provide the type of heightened, unusual motive necessary to support a strong inference of scienter. Moreover, Plaintiffs do not provide additional specific facts which support an inference that Defendants were motivated by a particularly urgent or desperate need to avert default on the corporation's debt covenants and prevent a significant devaluation of their Vlasic stock holdings. For instance, the Amended Complaint does not contain specific financial information or other facts to support Plaintiffs' suggestion that Vlasic would have been at serious risk of defaulting on its debt covenants had it been revealed prior to February 10, 2000 that, as a result of integration problems, the Gelco system was failing to function in a manner so as to provide an accurate accounting of trade expenses, or that the estimates provided in the company's financial reports failed to reflect the true extent of such expenses.

Indeed, those underlying facts specifically alleged in the Amended Complaint and contained in SEC disclosure documents referenced by the pleadings considerably undermine Plaintiffs' theory of motive. As the Complaint itself indicates, while Vlasic had been at risk of defaulting on its loans on at least one prior occasion, the company was able to successfully renegotiate the terms of its lending agreements, albeit under less favorable terms. (Amend. Compl. at ¶ 8). Indeed, in its First Quarter Form 10–Q filed with the SEC on December 10, 1999, over two months *before* Vlasic allegedly disclosed the actual extent of its trade marketing expenses, the company once again informed investors that it was on the verge of defaulting on its existing debt covenants and had begun discussions with its lenders to renegotiate the financial ratio covenants of the senior credit facility. (*Id.* at ¶ 99); *See* 1Q 2000 Form 10–Q at 9 n. 5, 14, attached as Ex. J to the Decl. of Gay Parks Rainville (warning investors that the Vlasic expected it "would not be in compliance with the financial ratio covenants as of the end of the second and third quarters of fiscal 2000"). Following this disclosure, Vlasic requested and obtained from its creditors a series of waivers which permitted it to avoid defaulting on its loan covenants for months after the company disclosed the problems with its trade management system and announced the need to make a significant upward adjustment in its reported trade expenses. (Amend. Compl. at ¶ 101); *see* 2Q 2000 Form 10–Q at 10 n. 8, attached as Ex. K to the Decl. of Gay Parks Rainville (informing investors that waiver of debt covenants was obtained through 6/20/00). In other words, during the period of time when Defendants were

allegedly fraudulently concealing or withholding material information about defects in the Gelco system in order to maintain compliance with the terms of the company's lending agreements, Vlasic publicly disclosed that it was at risk of defaulting on its debt covenants and was in the midst of negotiating with its creditors to obtain a waiver. After Vlasic revealed that its previous financial statements had significantly underestimated its customer deductions balance, the corporation was able to obtain a series of waivers from its creditors which allowed it to remain out of default. These facts cast serious doubt on any allegation that the Defendants were motivated to commit fraud by an urgent need to withhold from investors and lenders the fact that company was unable to meet the obligations imposed by its lending agreements.

Moreover, not only did neither Defendant attempt to sell any of their Vlasic shares or exercise any of their vested stock options during the relevant class period, but Defendant Bernstock substantially increased his holdings by purchasing 50,000 additional shares of Vlasic stock. While an individual corporate defendant's retention or sale of his or her stock holdings does not conclusively negate any inference of scienter, in the absence of other facts supporting Plaintiffs' theory of motive, these facts do tend to significantly undermine Plaintiffs' suggestion that Defendants were motivated by serious concerns about the company's survival and a desire to "save" or preserve that portion of their personal wealth which was tied up in Vlasic securities and stock options.

Accordingly, absent additional supporting facts, this Court concludes that Plaintiffs' allegations of "motive" based merely on the attenuated connection between nature of Defendants' compensation and the company's continued compliance with its debt covenants, while perhaps providing a plausible or rational theory of motive, fails to provide the type of heightened or unusual motive to commit fraud required to satisfy the Reform Act's heightened standard for pleading scienter.

### B.

■ Because Plaintiffs have not adequately alleged that the individual corporate defendants possessed both the motive and opportunity to commit fraud, the Complaint will survive a motion to dismiss only if it alleges specific facts that constitute "*strong* circumstantial evidence of conscious misbehavior or recklessness." *Advanta*, 180 F.3d at 534–35 (emphasis added). For purposes of the scienter requirement of Section 10(b) and Rule 10b–5, the Third Circuit has adopted the definition of recklessness articulated by the 7th Circuit Court of Appeals in *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977). *See Advanta*, 180 F.3d at 539–540. A reckless statement is a material misstatement or omission "involving not merely simple, or even inexcusable negligence, but an *extreme departure from the standards of ordinary care* " and "which presents a danger of misleading buyers or sellers that is *either known to the defendant or is so obvious that the actor must have been aware of it.*" *Id.* at 535 (3d Cir.1999) (quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979) (quoting *Sundstrand*, 553 F.2d at 1045)) (emphasis added). Allegations of intentional, conscious, or reckless misconduct, like allegations of motive and opportunity, must be supported by specific facts that give rise to a "strong inference" of scienter. *See id.*

■ According to the 7th Circuit, the relevant inquiry under this standard is "not merely whether [the defendant] had knowledge of the undisclosed facts; rather, it is the 'danger of misleading [that] must be actually known or so obvious that

any reasonable man would be legally bound as knowing.'" *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir.1989) (quoting *Sundstrand,* 553 F.2d at 1045.) As this suggests, knowledge or reckless disregard of the potential materiality of the information misstated or omitted is an element of scienter based on allegations of intentional or reckless misconduct. In the context of a claim that Defendants should have made certain disclosures earlier than they actually did, "allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to [permit an inference] that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to" a company's shareholders or prospective investors in order to deceive, manipulate or defraud. *City of Philadelphia,* 264 F.3d at 1260. As the 10th Circuit recently explained, making explicit what is left unstated in other cases:

> [T]o establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. *The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.*

*Id.* at 1261. For this reason, courts have been very reluctant to permit Plaintiffs to proceed on a "theory of fraud by hindsight" because corporate officials "are only responsible for revealing those material facts reasonably available to them" at the time of the alleged false or misleading statement or omission. *See Novak,* 216 F.3d at 309 (citing *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)); *City of Philadelphia,* 264 F.3d at 1260; *Cf. Carter-Wallace, Inc. Securities Litigation,* 150 F.3d 153 (1998).

▮ Here, Plaintiffs allege that, prior to February 10, 2000, Defendants either knew or were reckless in not knowing that material issues existed with respect to the integration and implementation of the Gelco system and its ability to properly capture outstanding customer deductions and trade expenses, but wrongfully failed to disclose these problems to the investing public during the class period. Knowing or recklessly disregarding that the system was not operating in a manner which generated accurate reports regarding the size of the company's outstanding balance of customer deductions and trade expenses, Defendants permitted Vlasic to issue financial reports which they knew or should have known materially underestimated the actual extent of such expenses.

Defendants concede that, in retrospect, the defects in the Gelco Trade Management System's tracking of trade market expenses and the complications experienced in the integration of that system into the company's main computer network were material insofar as the correction of these problems eventually revealed a much larger outstanding customer deduction balance than the company had estimated in its financial reports. However, Defendants argue that the Amended Complaint pleads no contemporaneous facts constituting strong circumstantial evidence that, prior to Vlasic's public disclosure of these problems and adjustment of its trade expense and customer deduction estimates on February 10, 2000, Defendants either knew or recklessly disregarded: (1) that Vlasic's new trade management computer system was unable to properly capture and

analyze trade marketing information; and (2) that such information would reveal materially more trade spending than had been estimated and reported by Vlasic in its financial statements. This Court agrees and therefore concludes that the specific allegations of Plaintiffs' Amended Complaint fail to provide strong circumstantial evidence of either conscious or reckless misconduct giving rise to the requisite strong inference of fraudulent intent.

Plaintiffs maintain that their Amended Complaint contains several specific factual allegations which strongly infer that Defendants knew or recklessly disregarded, prior to February 20, 2000, that the Gelco TMS system was failing to properly track and report current and prior customer trade deductions and failed to timely disclose this materially adverse information in its public filings. Specifically, Plaintiffs contend, based on a series of statements allegedly made by former Vlasic employees, that the Defendants possessed knowledge of facts, or had access to information, contradicting their public statements with regard to the operation of Vlasic's trade management system. These alleged statements consist of the following:

- The alleged representation by a former Vlasic manager of financial planning and analysis that "integration issues" made the implementation of Gelco's TMS system "messy." (Amended Compl. at ¶ 80).

- The alleged representation by a former director of Vlasic supply chain, whose "knowledge of Vlasic's customer deduction problems was not intimate," that even he was aware that significant problems existed relating to customer deductions at or around February, 1999, and that Vlasic devoted ever increasing resources to clearing customer deductions. (*Id.* at ¶ 81).

- The alleged representation by a former customer marketing manager who started with Vlasic in November 1999—approximately three months before Vlasic allegedly disclosed that its previous estimates had significantly understated its trade expenses—that "when he first started he became aware that a large deduction balance existed and that Vlasic's information technology and finance personnel should have known that Gelco's TMS system had failed to capture and analyze trade marketing spending and customer deductions." (*Id.* at ¶ 81).

Securities fraud claims have typically "sufficed to state a claim based on recklessness when they have *specifically alleged* defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting [or withholding] material facts related to the corporation." *Novak*, 216 F.3d at 308 (emphasis added). Plaintiffs do not, however, specifically allege that Defendants' themselves had direct knowledge of or access to material adverse facts with regard to the Gelco system's inability to accurately calculate the size of Vlasic's balance of unresolved customer deductions. Plaintiffs do not allege that Defendants either reviewed or had access to specifically identified documents or memoranda discussing the problems with the Gelco system. Nor do Plaintiffs specifically allege that Defendants participated in specific meetings or conversations in which these problems were discussed. *See Novak*, 216 F.3d at 309 (suggesting that, where plaintiffs contend that defendants had access to information contradicting their public statements, "they must specifically identify the reports or statements containing this information"); *In re NAHC Securities Litigation*, 2001 WL 1241007 at * 19 (E.D.Pa.) ("Where plaintiffs contend that the defendants had access to contrary

facts, they must specifically identify the reports or statements containing this information.").

Plaintiffs nevertheless contend that these allegations are sufficient to support a strong inference that Defendants *must have known* prior to February 2000 that the Gelco system was *not functioning* in a manner so as to generate financial data which accurately reflected the size of the company's unaccrued customer deductions and trade expenses. However, this Court concludes that the alleged statements of former Vlasic employees, even when considered collectively, are insufficiently specific to provide *strong* circumstantial evidence that Defendants recklessly disregarded *prior to February 2000* that material problems existed with respect to the Gelco system's ability to track and calculate the size of Vlasic's outstanding trade expenses and customer deductions. The first statement, a vague reference to "integration issues," neither identifies the nature or seriousness of those issues nor refers to a specific time period. The alleged statement of a former director of Vlasic's supply chain similarly refers only generally to his awareness as early as February 1999 of "significant problems relating to" customer deductions without specifying the nature of such problems—i.e. whether such problems related specifically to the Gelco trade management system's inability to keep track of these expenses—or suggesting that management was ever informed of the existence or severity of such problems. Finally, the alleged statement of a former customer marketing manager merely suggests that "that Vlasic's *information technology and finance personnel should have known*," at some time in November 1999 (approximately three months before Vlasic publicly disclosed the "truth" about the Gelco system and the actual size of the company's trade deduction balance) that

the Gelco TMS system was failing to properly capture and analyze trade marketing spending and customer deductions.

Plaintiffs further argue that Defendants' knowledge of material defects in Vlasic's trade management systems can be inferred from Defendants' positions and their access to detailed information about the company's business, as well as the fact that "Vlasic's TMS system and customer deductions are clearly information which involves key aspects of Vlasic's business." (Pl.s' Br. Opp'n M. Dis. at 20–21). However, such generalized imputations of knowledge have largely been foreclosed by the PSLRA. *See In re Advanta,* 180 F.3d at 539 ("It is well established that a pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of facts") (internal quotations and citations omitted). While district courts in this jurisdiction have, in some limited circumstances, imputed knowledge to individual defendants when disclosures involve the company's "core business," *see, e.g., Campbell,* 145 F.Supp.2d at 599; *In re Aetna, Inc. Sec. Litig.,* 34 F.Supp.2d 935, 953–954 (E.D.Pa.1999); *Tel–Save Sec. Litig.,* 1999 WL 999427, at * 5 (E.D.Pa.1999), such generalized imputations of knowledge do not suffice to establish that Defendants possessed knowledge and information regarding specific aspects of the company's business. Here, while it can be presumed that Defendants, as senior executives, were familiar with Vlasic's efforts to implement and integrate the Gelco trade management system, such generalized imputations of knowledge, standing alone, do not suffice to establish that Defendants either knew or should have known of the existence of specific defects in the operation of the system prior to February 2000.

Moreover, even if these allegations were sufficient to permit an inference that De-

fendants should have known that the Gelco system was not functionally properly prior to February 2000, Plaintiffs have not alleged specific facts showing that Defendants either knew or should have known that any uncaptured customer deductions, once captured, would reveal a *material* difference in trade spending than had been originally estimated by Vlasic. Plaintiffs' Amended Complaint relies solely on the vague and conclusory allegations, unsupported by particularized facts, that Defendants, as former top executives of Campbell, were familiar with Campbell's alleged aggressive discounting and sales practices and therefore should have anticipated a larger customer deduction balance than that reported in Vlasic's financial statements prior to the company's February 2000 press release. Absent additional particularized facts, this allegation, by itself, does not constitute strong circumstantial evidence Defendants knew or should have recognized the potential materiality of the deficiencies in the Gelco system.

Accordingly, Plaintiffs have not stated particularized facts supporting a strong inference that Defendants' failure to detect and disclose material defects in Vlasic's Gelco trade management system constituted " 'an extreme departure from the standards of ordinary care' or recklessly ignored 'a danger of misleading buyers or sellers that is either known to the defen-

dant or is so obvious that the actor must have been aware of it.' " *City of Philadelphia*, 264 F.3d. at 1269. Plaintiffs' Section 10(b) and Rule 10b–5 claims will therefore be dismissed.[16]

### V.

Plaintiffs' Amended Class Action Complaint further alleges that, as senior officers of Vlasic, Defendants Bernstock and Goldstein violated Section 20(a) of the Exchange Act. Section 20(a) creates secondary liability for those determined to be "control persons" of a corporation. 15 U.S.C. § 78t(a).[17] In order to state a cause of action for control person liability under Section 20(a), Plaintiffs must allege: (1) an underlying primary violation by a controlled person or entity; (2) that Defendants exercised control over the primary violator; and (3) that the Defendants, as "controlling persons," were in some meaningful sense culpable participants in the fraud. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998); *see also In re Party City Securities Litigation*, 147 F.Supp.2d 282, 317 (D.N.J. 2001).

Liability under Section 20(a) "is predicated upon an independent violation of 'this chapter or the rules or regulations thereunder.' " *In re Party City*, 147 F.Supp.2d at 317; *Cf. Advanta*, 180 F.3d

---

**16.** Absent sufficient allegations of fraudulent intent, Plaintiffs claims regarding violations of GAAP similarly fail to state a claim for securities fraud. *See Novak*, 216 F.3d at 309 ("Allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."); *Chill v. General Electric Co.*, 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.").

**17.** Section 20(a) of the Securities Exchange Act of 1934 provides, in relevant part:

(a) Joint and several liability; good faith defense.

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

at 541. Claims under this section are, therefore, "derivative, requiring proof of a separate underlying violation of the Exchange Act." *Advanta,* 180 F.3d at 541; *see also, Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir.1994) ("[T]o state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations."); *In re VeriFone Sec. Litig.,* 11 F.3d 865, 872 (9th Cir.1993) (observing that if plaintiffs "have failed to allege an actionable independent underlying violation of the '34 Act, they similarly cannot maintain a claim under § 20A"). Accordingly, because Plaintiffs' Amended Class Action Complaint fails to adequately plead an actionable predicate violation of Section 10(b) or Rule 10b–5, Plaintiffs' claim for "control person" liability under Section 20(a) must also be dismissed.

### VI.

For the reasons stated above, Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint is granted. The Court will enter an appropriate order.