**In re NUI SECURITIES LITIGATION.**

**Jack Klebanow, et al., Plaintiffs,**

**v.**

**NUI Corporation, et al., Defendants.**

**Civil Action No. 02–5220(MLC).**

United States District Court,
D. New Jersey.

April 23, 2004.

Joseph J. DePalma and Katrina Blumenkrants, Lite DePalma Greenberg & Rivas, LLC, Newark, NJ, for Plaintiffs.

Jacob A. Goldberg and Christopher Nelson, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, for Plaintiffs.

Michael R. Cole and Gregory J. Bevelock, DeCotiis, Fitzpatrick, Cole & Wisler, LLP, Teaneck, NJ, for Defendants.

Glenn M. Kurtz and Robert E. Tiedemann, White & Case LLP, New York City, for Defendants.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on the motion by defendants, NUI Corporation ("NUI"), John Kean, Jr. ("Kean") and Mark Abramovic ("Abramovic"), to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Defendants claim plaintiffs[1] fail to plead with sufficient particularity the securities fraud violations alleged. For the reasons stated herein, defendants' motion will be granted in part and denied in part.

## BACKGROUND

### I. Scope of Inquiry

■ On a motion to dismiss the Court accepts as true the well-pled allegations in the Second Amended Complaint, and may consider "the documents incorporated by reference therein." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 206 (3d Cir.2002).[2] Plaintiffs state that the

---

1. This case has been pled as a class action, though it has not yet been certified as one. (2d Am.Compl.) Accordingly, we will refer to "plaintiffs" throughout this opinion, though at present there is only the lead plaintiff, Lincluden Management Ltd.

2. The Court's analysis on a motion to dismiss is usually limited to the complaint. However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment. The ratio-

nale underlying this exception is that the primary problem raised by considering documents outside the complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual notice and has relied upon the documents in framing the complaint.

*Jones v. Intelli–Check, Inc.*, 274 F.Supp.2d 615, 625–26 (D.N.J.2003) (quotations and citations omitted). Accordingly, in addition to the Second Amended Complaint, the briefs submitted by the parties, and oral argument held on March 15, 2004, the Court has considered the following documents, all of which

allegations in the Second Amended Complaint are

> based upon the investigation of [lead] plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by NUI ..., securities analysts' reports about [NUI], press releases and other public statements made by ... defendants, media reports about [NUI] and interviews with former [NUI] employees.

(2d Am. Compl. at 1.) A significant portion of plaintiffs' allegations regarding defendants' misconduct are based on information provided by Charles Eisenberg ("Eisenberg"), a former employee of NUI Telecom ("Telecom"), a subsidiary of NUI. (*Id.* at ¶ 24.) Eisenberg held the position of operations director for Telecom's international division from February 2002 through July 2002, when his employment was terminated. (*Id.*)

## II. *Plaintiffs' Allegations*

Plaintiffs bring this securities fraud action on behalf of all purchasers of NUI securities between November 8, 2001, and October 17, 2002 ("the Class Period"). (*Id.* at ¶ 1.) Plaintiffs claim that during the Class Period, defendants failed "to disclose known risks regarding [NUI's] business and issued false and misleading statements about its businesses, current and future financial prospects and results, causing NUI's stock to trade at artificially inflated levels during the Class Period." (*Id.* at ¶ 3.) Specifically, plaintiffs claim defendants intentionally inflated NUI's earnings by (1) making misleading statements concerning, and failing to properly record, NUI's true bad debt levels ("the bad debt practice") and (2) pursuing illegal telecommunications billing practices ("reterminating"). (*Id.* at ¶ 5.)

NUI announced to the public on October 18, 2002, that contrary to previous forecasts it would "sustain greatly reduced earnings for its 2002 fiscal year." (*Id.* at ¶ 6.) As a result, NUI's share price decreased by more than 50%. (*Id.*) Plaintiffs instituted this action shortly thereafter.

NUI is a Delaware corporation with its "principal executive offices" in New Jersey. (*Id.* at ¶ 11.) Telecom is a subsidiary of NUI. (Def. Supp. Br. at 1.) Kean is, and at all relevant times was, NUI's president and CEO. (2d Am. Compl. at ¶ 12.) Abramovic is, and at all relevant times was, NUI's CFO. (*Id.* at ¶ 13.) At all relevant times, both Kean and Abramovic: were directors and members of NUI's Executive Committee; acted as spokespersons for NUI; participated in the day-to-day management and overall direction of NUI; had access to confidential proprietary information concerning NUI; and were "actively involved in preparing, reviewing, authorizing and disseminating NUI's public statements, as well as [their] own statements." (*Id.* at ¶¶ 12–13.) Plaintiffs allege that all of the defendants "either knew or recklessly disregarded that the wrongful course of conduct and misleading statements and omissions described [in the Second Amended Complaint] would ... artificially inflate or maintain the price of NUI securities." (*Id.* at ¶ 14.)

are integral to or explicitly relied upon in plaintiffs' pleading: An 11–8–01 NUI press release (Bevelock Cert., Ex. 2); NUI's 12–21–01 Form 10–K SEC filing (*id.*, Ex. 3); a 1–18–02 NUI press release (*id.*, Ex. 4); NUI's 2–12–02 Form 10–Q SEC filing (*id.*, Ex. 5); NUI's 2–15–02 Amendment to its Form S–3 SEC filing (*id.*, Ex. 6); a 2–22–02 NUI press release (*id.*, Ex. 7); a 5–1–02 NUI press release (*id.*, Ex. 8); NUI's 5–14–02 Form 10–Q SEC filing (*id.*, Ex. 9); a 7–12–02 NUI press release (*id.*, Ex. 10); a 7–24–02 NUI press release (*id.*, Ex. 11); NUI's 8–14–02 Form 10–Q SEC filing (*id.*, Ex. 12); and a transcript of a 10–18–02 NUI conference call (3–15–04 Pl. Letter, Ex.).

Count I of the Second Amended Complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), codified at 15 U.S.C. § 78j, and Rule 10b–5, codified at 17 C.F.R. § 240.10b–5, by all of the defendants. (*Id.* at ¶¶ 125–34.) Count II alleges that Kean and Abramovic violated Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a). (*Id.* at ¶¶ 135–38.)

### LEGAL STANDARDS

#### I. Rule 12(b)(6), Rule 9(b), and the PSLRA

A court may dismiss a complaint pursuant to Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). On a motion to dismiss we generally must accept as true all of the factual allegations in the complaint, and must draw all reasonable inferences in favor of the plaintiffs. *Doe v. Delie,* 257 F.3d 309, 313 (3d Cir.2001). The Court need not credit bald assertions or legal conclusions alleged in the complaint, however. *See, e.g., In re Nice Sys., Ltd. Sec. Litig.,* 135 F.Supp.2d 551, 565 (D.N.J. 2001). "Dismissal of claims [on a motion to dismiss] is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim upon which relief may be granted." *Jakomas v. McFalls,* 229 F.Supp.2d 412, 419 (W.D.Pa. 2002).

■ A securities fraud action, however, "requires more than mere reference to the conventional standard applicable to motions under Rule 12(b)(6)." *In re Rockefeller,* 311 F.3d at 215. Rather, the Private Securities Litigation Reform Act ("PSLRA"), codified at 15 U.S.C. § 78u–4 *et seq.,* and Rule 9(b) impose heightened pleading requirements that must be satisfied for a complaint sounding in securities fraud to survive a motion to dismiss. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 531 (3d Cir.1999); *In re Burlington*

*Coat Factory Sec. Litig.,* 114 F.3d 1410, 1424 (3d Cir.1997).

■ Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." "This particularity requirement has been rigorously applied in securities fraud cases." *In re Burlington,* 114 F.3d at 1417 (citations omitted). Though Rule 9(b) does not require plaintiffs to plead every material detail of the fraud, it nevertheless "requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." *In re Rockefeller,* 311 F.3d at 217 (quotations and citations omitted).

Courts are sensitive, however, "to the fact that application of [Rule 9(b)] prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 284 (3d Cir.1992) (quotations and citations omitted). "Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington,* 114 F.3d at 1418.

■ The PSLRA, too, mandates more particularized pleading. Specifically, it requires plaintiffs to

specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). This "particularity [requirement] . . . extends that of Rule

9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." *In re Rockefeller*, 311 F.3d at 218.

■ The PSLRA also modifies the burden of pleading intent, or scienter, by requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To plead scienter in compliance with the PSLRA, plaintiffs must allege facts that either "(1) establish a motive and an opportunity to commit fraud, or (2) constitute circumstantial evidence of either reckless or conscious behavior." *In re Digital Island Sec. Litig.*, 357 F.3d 322, 328–29 (3d Cir.2004). *See also In re Advanta*, 180 F.3d at 534–35. "Either way, plaintiffs must plead facts 'with particularity,' and these facts must give rise to a 'strong inference' of a knowing or reckless misstatement." *In re Digital Island*, 357 F.3d at 329. *See also id.* at 330 (noting that "the PSLRA requires a strong—as opposed to merely reasonable—inference [of scienter] to survive a motion to dismiss").

## II. *Section 10(b) and Rule 10b–5*

■ Section 10(b) and Rule 10b–5 create liability for securities fraud. Section 10(b) provides, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b–5, which establishes a private cause of action, was promulgated by the SEC in order to implement this section. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Rule 10b–5 makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ Five elements must be pled to state a Rule 10b–5 claim:

(1) a specific false or misleading statement in connection with the purchase or sale of a security

(2) of a material fact

(3) with the intention that it should be acted upon,

(4) upon which plaintiff relied

(5) to plaintiff's detriment.

*See Semerenko v. Cendant Corp.*, 223 F.3d 165, 174 (3d Cir.2000); *Jones*, 274 F.Supp.2d at 626.

### a. *False or Misleading Statements*

■ Defendants can be liable for both affirmative misstatements and misleading omissions. Omissions, however, can give rise to liability only where the defendant had an affirmative duty to disclose the

information in question, such as "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran v. Stafford*, 226 F.3d 275, 285–86 (3d Cir. 2000). *See also In re Aetna Inc. Sec. Litig.*, 34 F.Supp.2d 935, 948 (E.D.Pa.1999) ("There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading."). Under the PSLRA, courts must analyze each statement at issue to determine whether each alleged misrepresentation is pled with the requisite particularity. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 712 (3d Cir.1996).

### b. *Materiality*

Rule 10b–5 "explicitly require[s] a well-pleaded allegation that the purported misrepresentations or omissions at issue were material." *In re Rockefeller*, 311 F.3d at 211. A fact is material only if "there [is] a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the investing public. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

### c. *Scienter*

"[T]o state a violation under Rule 10b–5, plaintiffs must allege that defendants acted with the requisite state of mind." *In re Rockefeller*, 311 F.3d at 211. To be actionable, a material misstatement "must be made with conscious or reckless disregard of its falsity." *In Re ATI Techs., Inc., Sec. Litig.*, 216 F.Supp.2d 418, 428 (E.D.Pa.2002). As noted *supra*, to establish this state of mind plaintiffs must plead facts that either (1) constitute circumstantial evidence of either reckless or conscious behavior or (2) establish a "motive and opportunity" to commit fraud.

Conscious misbehavior is alleged by "stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." *In re Advanta*, 180 F.3d at 535. "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading ... that is either known to defendant or is so obvious that the actor must have been aware of it." *In re Digital Island*, 357 F.3d at 332 (quotations and citations omitted). Motive and opportunity are properly stated when a plaintiff alleges facts showing that defendants "had the motive to commit fraud and a clear opportunity to do so." *Wilson v. Bernstock*, 195 F.Supp.2d 619, 633 (D.N.J. 2002) (quotations and citations omitted).

### d. *Reasonable Reliance*

"To state a claim for securities fraud under Section 10(b) and Rule 10b–5 thereunder, a complaint must show that plaintiffs reasonably relied on defendants' allegedly fraudulent misrepresentations, omissions, or conduct." *Jones*, 274 F.Supp.2d at 632 (citing *Zlotnick v. TIE Communications*, 836 F.2d 818, 821 (3d Cir.1988)). Defendants do not contest that reasonable reliance has been properly alleged.

### e. *Damage*

Plaintiffs in securities fraud cases must plead (1) damages and (2) that their reliance on the fraud proximately caused those damages. *See Semerenko*, 223 F.3d at 174; *In re Rent–Way Sec. Litig.*, 209 F.Supp.2d 493, 512 (W.D.Pa.2002). This second requirement is sometimes called pleading "loss causation." Defendants do not contest that plaintiffs have adequately pled both of these elements for their claim

based on the alleged bad debt practice. Defendants do, however, claim plaintiffs have not properly pled damages or loss causation for the alleged reterminating practice.

### III. Section 20(a)

■■■■ "Section 20(a) creates a cause of action against individual defendants alleged to have been 'control persons' of companies guilty of securities fraud." *Jones*, 274 F.Supp.2d at 644. Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). One can be liable under this section for exercising control over a corporation that has committed securities fraud. *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 940 (D.N.J.1998). Plaintiffs alleging a Section 20(a) violation "must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Jones*, 274 F.Supp.2d at 645.[3]

### DISCUSSION

### I. Retermination

■■■■ Plaintiffs allege Telecom engaged in illegally "re-terminating" intrastate calls. (2d Am. Compl. at ¶ 23.) According to plaintiffs,

> [i]ntrastate calls are typically billed at a higher per minute rate than interstate calls. For example, many interstate calls were billed by providers at $0.03 per minute, while in-state calls were billed by local phone companies at $0.07 per minute. For calls among New Yorkers, Vermonters and West Virginians, Telecom routed in-state calls to lines in different states. It then "digit stripped" the calls, removing routing information which would tip off local carriers to the scheme, which then re-routed the calls back to the state from where they originated. Thus, the total cost of the call to Telecom was $0.03 while it charged customers $0.07 for what was an in-state call, unlawfully increasing its [profit] margins in violation of GAAP.[4]

(*Id.; see also* ¶¶ 38, 87 (repeating same).) Plaintiffs conclusorily allege the reterminating practice was done with the knowledge of Telecom senior managers. (*Id.* at ¶ 38.)

Plaintiffs allege the reterminating practice caused NUI to overstate revenue in each quarter of the Class Period, in violation of GAAP. (*Id.* at ¶ 45.) GAAP prohibits companies from recording as income monies attained illegally. (*Id.* at ¶¶ 45–

---

**3.** Defendants claim that Section 20(a) plaintiffs must also plead facts showing the individual defendants' "culpable participation." While plaintiffs will have to prove culpable participation at trial, "the overwhelming trend in this circuit is that culpable participation does not have to be plead in order to survive a motion to dismiss." *Jones*, 274 F.Supp.2d at 645 (quotations and citations omitted). *See also In re Rent–Way*, 209

F.Supp.2d at 523 ("[W]e conclude that 'culpable participation' need not be pled in a Section 20(a) action."); *In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 600 (D.N.J. 2001) (same). Therefore, we need not inquire whether plaintiffs have pled culpable participation.

**4.** "GAAP" stands for "generally accepted accounting principles."

46.) Because NUI was not legally entitled to the revenue it secured from the reterminating practice, plaintiffs claim, NUI violated GAAP by recording the reterminating proceeds as income. (*Id.* at ¶ 46.) Plaintiffs allege throughout the Second Amended Complaint that defendants made various statements that were false or misleading because they did not disclose that NUI was improperly recording the retermination revenue. (*Id.* at ¶¶ 50–108.)

Defendants contend that plaintiffs fail to state a securities fraud violation with respect to the reterminating practice because, *inter alia*, plaintiffs have not alleged either damage or loss causation. We agree. Assuming *arguendo* that retermination is illegal and defendants intentionally concealed the practice, plaintiffs do not allege that they have suffered any resultant loss. Rather, plaintiffs claim that *someday* they will be damaged. At oral argument, plaintiffs' counsel told the Court that "[t]hat income is illegal. *Eventually* it will be subject to disgorgement." (3–15–04 Tr. at 46 (emphasis added).) Counsel conceded, however, that plaintiffs have not alleged that anyone has disputed the retermination practice, or instituted legal proceedings to recoup the alleged illegal charges. (*Id.* at 48.) Nor do plaintiffs allege a causal nexus between the retermination scheme and the drop in NUI's stock price following the October 18, 2002, announcement. (*Id.* at 49–50.)

We hold that plaintiffs have failed to state a securities fraud claim with respect to the alleged retermination practice because they have not alleged damage or loss causation.[5] Therefore, defendants' motion to dismiss will be granted insofar as it seeks to dismiss this part of the Second Amended Complaint.

## II. *Bad Debt Practice*

### a. *The Practice Alleged: Mischaracterization of Bad Debt and Resultant Overstatement of Income*

Plaintiffs claim that defendants misled investors because NUI's earnings statements and other communications made during the Class Period were based on accounting practices that defendants knew or should have known were improper. A plaintiff alleging that "defendants distorted certain data disclosed to the public by using unreasonable accounting practices [must] state what the unreasonable practices were and how they distorted the disclosed data." *In re Burlington,* 114 F.3d at 1417–18. *See also Shapiro,* 964 F.2d at 284–85. We hold that the Second Amended Complaint satisfies this pleading requirement.

Plaintiffs allege that in March and June 2002, Eisenberg learned of three outstanding Telecom accounts that were uncollectible. (2d Am. Compl. at ¶¶ 29–31.) Eisenberg unsuccessfully attempted in March 2002 to contact the customers on two of these accounts, USTI and Asics, and collect payment. (*Id.* at ¶ 30.) The combined amounts owed on these accounts totaled between $300,000 and $350,000. (*Id.*) The third account, Huntington Group, was also allegedly nonpaying. (*Id.* at ¶ 31.) Plaintiffs allege this account represented more than $400,000 in bad debt. (*Id.*) Together, plaintiffs allege that Telecom had between $700,000 and $750,000 in bad debt.

Plaintiffs further allege that in its financial records NUI improperly characterized these nonperforming accounts as "billing in dispute" rather than as bad debt. As a result, the nonpaying accounts were con-

---

**5.** It also appears that plaintiffs have not alleged scienter with sufficient particularity.

However, we need not reach that issue.

sidered accounts receivable, and counted as income for Telecom and NUI. (*Id.* at ¶ 32.) Plaintiffs claim that had these accounts been properly classified on Telecom's balance sheet, Telecom's losses would have nearly doubled for the quarter ending June 20, 2002. (*Id.*) Plaintiffs allege that these three bad debts remained improperly classified "through at least July 2002." (*Id.* at ¶ 74.)

Plaintiffs also allege that NUI had other mischaracterized bad debts throughout the Class Period, beyond the three uncovered by Eisenberg. (*Id.* at ¶ 32; 3–15–04 Tr. at 36.) The basis for this allegation is an October 18, 2002, conference call in which Kean revealed the reasons for NUI's announcement that it would not meet its earnings projections. (2d Am. Compl. at ¶ 103.) Among other factors, Kean stated in this conference call that an increase in the level of bad debt company-wide accounted for 20% of NUI's earnings shortfall. (*Id.*)

Plaintiffs claim that NUI's failure to properly classify these bad debts throughout the Class Period violated GAAP. They assert that SEC regulation S–X, codified at 17 C.F.R. § 210.4–01(a)(10), requires that financial statements filed with the SEC conform with GAAP. (2d Am. Compl. at ¶ 39.) NUI's SEC filings, however, and therefore its stated earnings, were in violation of GAAP because, *inter alia*, NUI "failed to adequately reserve for bad debt

in accordance with Statement of Financial Accounting Standards ("SFAS") No. 5: *Accounting for Contingencies.*" (*Id.* at ¶¶ 40, 43–44 (alleging the specific requirements of SFAS No. 5).) That is, "NUI's financial statements were false and misleading and violated GAAP, because [NUI] failed adequately to reserve for bad debts, including but not limited to the known bad debt of at least $750,000 which was classified ... as 'billing in dispute.'" (*Id.* at ¶ 41.)[6]

We find that plaintiffs have adequately pled the practice that forms the basis for their securities fraud allegation. This case presents allegations analogous to those addressed in *In re Burlington.* There, the defendant's stock price dropped after it publicly announced that in three quarters it had overstated its earnings by two to three cents per share. Plaintiffs alleged that the overstatements were due to improper accounting for expenses associated with purchases of inventory, and identified a specific accounting concept that was violated. The Court of Appeals found this recitation to be "an adequate allegation of 'how' [defendant] overstated its earnings, so we cannot say that plaintiffs have failed to state their claim with adequate particularity." 114 F.3d at 1422.

The same is true here. Plaintiffs have alleged defendants engaged in an improper practice throughout the Class Period, in violation of a specific GAAP rule, that led to overstated earnings reports and projections.[7] *Accord In re ATI Techs.*, 216

**6.** Defendants argue that plaintiffs cannot claim NUI failed to adequately reserve for bad debts because NUI's financial statements demonstrate that the bad debt reserve was large enough to encompass the $750,000 of alleged Telecom bad debt. (Def. Supp. Br. at 15–16.) This argument fails for two reasons. First, plaintiffs allege more than just the $750,000 of bad debt identified by Eisenberg. Second, even if plaintiffs only alleged $750,000 of bad debt, defendants' observation misses the thrust of plaintiffs' claims. Plaintiffs do not allege the bad debt reserve was

less than $750,000. Rather, they claim that however large the bad debt reserve was, it was at least $750,000 short of what it should have been under GAAP because of the decision to characterize the accounts in question as "billing in dispute" rather than bad debt. Thus, the issue is not how much was reserved, but whether (at least) $750,000 was specifically set aside to account for the alleged bad debt.

**7.** Defendants assert that plaintiffs cannot base their fraud allegations on an alleged failure to properly account for bad debts, and draw an

F.Supp.2d at 436–37 (holding plaintiffs state securities fraud claim when "complaint [particularly] alleges that defendants failed timely to write down impaired inventory during the purported class period, inflating inventory levels, and, in turn, artificially inflating reported gross margins, net income, and earnings per share").[8]

#### b. *False or Misleading Statements*

■ We now assess whether plaintiffs particularly allege all five elements of a Section 10(b) and Rule 10b–5 claim. We first must "analyze each statement at issue in order to assess whether each alleged misrepresentation is pleaded with the requisite specificity." *Id.* at 429. If any alleged misrepresentation is not alleged with sufficient specificity, the Court will dismiss the Second Amended Complaint insofar as it alleges that the statement in question constitutes securities fraud. *See* 15 U.S.C. § 78u–4(b)(3)(A).

#### i. *Statements by NUI* [9]

Plaintiffs allege the following false or misleading statements by NUI:

(1) *November 8, 2001, press release & conference call.* NUI issued a press re-

---

analogy to *Shapiro v. UJB Financial Corp.*, 964 F.2d 272 (3d Cir.1992). (Def. Supp. Br. at 14.) In *Shapiro*, the Third Circuit observed that the "mere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable." 964 F.2d at 281. Rather, the court held that a plaintiff may only sue for securities fraud on the basis of allegedly inadequate debt reserve practices "where a defendant affirmatively characterizes [its] practices as 'adequate,' 'conservative,' 'cautious,' and the like." *Id.* at 282. Because plaintiffs do not allege that NUI ever characterized its bad debt reserves in such a way, defendants conclude, plaintiffs fail to state a securities fraud claim. *See also Gannon v. With Regard to Count One through Count Five*, 920 F.Supp. 566, 579–80 (D.N.J.1996) (holding allegations that defendant failed to disclose reasons for not establishing adequate debt reserve "are essentially [unactionable] claims of failure to disclose breach of fiduciary duty or corporate mismanagement").

*Shapiro*, however, is distinguishable. Unlike in that case, plaintiffs here do not merely allege that defendants' accounting practices were "inadequate, meaningless, out of control, or ineffective." 964 F.2d at 281. Rather, they allege defendants intentionally mischaracterized at least $750,000 of uncollectible accounts in order to inflate earnings and, concomitantly, share price. *See infra.* The alleged practice is more than just inadequate: it is deceptive and fraudulent. The analysis of *Shapiro* thus does not apply to plaintiffs' claims.

**8.** Defendants contend that plaintiffs have not pled the alleged bad debt practice with sufficient particularity because, *inter alia*, they do not "allege any facts concerning (i) the level of NUI's bad debt stated in its financials, (ii) what the allegedly 'true' level of bad debt should have been, (iii) specific transactions and amounts of allegedly undisclosed bad debt, [and] (iv) facts providing a basis for requiring an accounting write-off." (Def. Supp. Br. at 15.) We disagree. The burden on plaintiffs, while heavy, is not as overwhelming as defendants suggest, and is satisfied by the allegations in the Second Amended Complaint. *See In re Campbell Soup*, 145 F.Supp.2d at 592 (rejecting defendants' argument that the complaint was insufficiently particular because "Plaintiffs failed to allege how widespread the [allegedly improper practice] was," and observing instead that "[w]hile Plaintiffs will need to 'fill in the details' to prove their claims, Plaintiffs have sufficiently plead the who, what, where, when, and how of the allegedly fraudulent practices . . .").

**9.** Plaintiffs also allege Kean and Abramovic made a number of false and misleading statements. (2d Am. Compl. at ¶¶ 50, 56, 58, 62, 65, 76, 91–94, 99.) Because we find, *infra*, that plaintiffs have not properly alleged that Kean and Abramovic made these statements with scienter, we address their statements only to the extent they are also considered statements by NUI.

lease, and held a conference call with securities analysts. NUI announced earnings of $22.7 million for fiscal year ("FY") 2001. (2d Am. Compl. at ¶ 50.) It also announced earnings for the fiscal fourth quarter of 2001. (*Id.*) Kean stated in the press release:

> While the deterioration of market conditions in the telecom sector created challenges for part of our business, our core enterprises once again demonstrated strong growth and increased profitability. In fact, excluding the impact of TIC [a company purchased by NUI in 2001], our earnings per share would have been $2.15, representing an increase of more than 10 percent compared to the operating earnings in fiscal 2000.
>
> While the challenges faced by TIC. this year clearly impacted our consolidated results, those challenges also provided us with the opportunity to demonstrate our commitment to turning the business around. We took decisive action, reduced costs, restructured the operations, and achieved profitability in October. While it is too early to determine the timing of the recovery of telecom sector [sic], adding new products will enable us to continue to build profitability as we move forward. With the TIC reorganization behind us and our core businesses poised for another strong year, we can focus on returning to our pattern of producing superior returns for our shareholders.

(*Id.*)

(2) *December 21, 2001, filing of NUI's Annual Form 10–K.*[10] Defendants filed the form with the SEC, signed by Kean and Abramovic. (*Id.* at ¶ 56.)

(3) *January 2002 analyst conference.* NUI held a conference in which it "confirmed its 2002 EPS[11] estimates of between $2.10 and $2.15." (*Id.* at ¶ 57.)

(4) *January 18, 2002, press release & conference call.* NUI issued another press release and held a conference call with securities analysts. (*Id.* at ¶¶ 58–59.) NUI announced first quarter FY 2002 earnings and claimed in the press release that "earnings from continuing operations outpace analyst consensus estimate [sic] despite warm temperatures." (*Id.* at ¶ 58 (brackets omitted).) Kean stated in the press release:

> NUI emerged from the first quarter of the new fiscal year with solid operating performance. These have been extraordinary times—for NUI, businesses in general and the nation as a whole. With the nation already struggling with a sluggish economy, the devastating events of September 11 further impaired business activities of all kinds.
>
> For NUI, the challenge of a declining telecommunications equipment market combined with record warm temperatures during the start of the heating season represented what appeared to be insurmountable barriers to overcome. Nevertheless, NUI, once again, demonstrated its ability to quickly take the steps necessary to adjust to changing conditions and produce better-than-anticipated results in the quarter.

(*Id.*) The conference call reiterated the substance of the press release. (*Id.* at ¶ 59.)

(5) *January 22, 2002, NUI shareholder meeting.* Kean addressed the shareholders and stated that "despite the many challenges we faced last year, all our busi-

---

**10.** Form 10–K is used for filing with the SEC annual and transition reports detailing, *inter alia,* a corporation's annual earnings. 17 C.F.R. § 249.310. *See* 15 U.S.C. §§ 78m,

78o(d) (prescribing contents of annual reports).

**11.** "EPS" is an abbreviation for "earnings-per-share."

nesses increased market share, except for one. That is due to NUI's strength of remaining flexible in order to react to business demands and business opportunities alike." (*Id.* at ¶ 62 (brackets omitted).) Kean continued:

> In 1995 we developed and in 1996 introduced a five-year plan that included reaching a billion dollars in annual revenue by 2001. In 1995 NUI had about $377 million in revenues. Today, our annual revenues exceed $1.0 billion. We already had a solid foundation with our 147–year–old utility business. Our strategy was to create value by stacking diverse growth opportunities onto our solid base of utility customer relationships and assets. By directing the strengths of our core skills and knowledge down less traditional—but still related—paths, we positioned the company for growth. The plan is working.
>
> Because the trading entities of other companies appeared so successful, our trading practices were often discounted in the marketplace. But we believed in our management skills and our knowledge of the market. We stuck to our guns and continued to trade in a way that we knew would benefit our shareholders and provide us with a more consistent earnings stream than is typical from a trading organization.
>
> [NUI's sales outsourcing arm, TIC, was significantly impacted by] the demise of the telecom equipment sector. However, because our plan calls for NUI to be flexible and quick to take action, we have stabilized this business.
>
> Despite ... seemingly insurmountable obstacles, our sound business strategy and management skills allowed us to move quickly to take the decisive actions that enabled us to produce results that were clearly better than anticipated in our first quarter of the new fiscal year. We will continue to watch gas prices and manage our portfolio in a manner that both takes advantage of downturns and protects us from upswings. We will continue to follow a formula that has led to so much success in our trading operation and that allows us to benefit from gas price volatility. As we have since 1995, we will expand our business activities outside of natural gas distribution in a profitable way so that our vulnerability to weather continues to lessen. Similarly, we will remain flexible and diverse as we continue to expand and identify new business opportunities—better insulating us from both broad economic downturns and specific market swings.
>
> Today NUI is positioned to move forward as we continue to implement, refine and expand the strategy for success we laid out five years ago. As our 2001 annual report discusses, we have the unique combination of ingenuity and continuity that both allowed us to weather the changes of 2001 and the first quarter of this year, as well as to identify opportunities for success in the future.

(*Id.* (alterations in original).)

(6) *February 12, 2002, filing of NUI's Quarterly Form 10–Q.*[12] NUI filed this form, signed by Kean and Abramovic. (*Id.* at ¶ 65.) The form claimed that "Telecom had increased revenues by $1.6 million, or 71%, because of customer growth." (*Id.*)

(7) *February 15, 2002, filing of Amendment 1 to NUI's Form S–3 Registration Statement.*[13] NUI filed this form with the

---

12. Form 10–Q is used for filing with the SEC quarterly and transition reports detailing, *inter alia,* a corporation's quarterly earnings. 17 C.F.R. §§ 249.308a, 240.13a–13, 240.15d–

13. *See* 15 U.S.C. §§ 78m, 78o(d) (prescribing contents of quarterly reports).

13. Form S–3 is used "for registration ... of securities of certain issuers offered pursuant

SEC. (*Id.* at ¶ 67.) It generally discussed NUI's business, and the risk factors facing the business. (*Id.*)

(8) *February 22, 2002, press release.* NUI announced that it was lowering its FY 2002 EPS prediction by $0.20 to $0.25. (*Id.* at ¶ 68.) The drop was attributed to "extremely warm temperatures year to date and the weak economy." (*Id.*) NUI continued, however, that "cost cutting measures and better-than-anticipated results from the company's wholesale marketing and trading segment have partially offset the impact of the warm temperatures and the weak economy." (*Id.* (brackets omitted).)

(9) *May 1, 2002, press release & conference call.* NUI issued another press release and held a conference call with securities analysts. (*Id.* at ¶¶ 76 & 78.) In both, NUI announced its earnings for the second quarter of FY 2002. (*Id.*) NUI stated it was not changing the EPS guidance it had issued on February 22, 2002. Kean explained:

> A number of external factors, such as record warm temperatures, a sluggish economy, and extremely weak demand in the telecommunications equipment market, have presented major challenges for our businesses to overcome. Despite these factors, we have made significant progress on many strategic fronts. We further strengthened our balance sheet by completing a very successful equity offering, our billing and mapping unit, Utility Business Services, was awarded a significant contract, our telecom business added to its customer base through the acquisition of another firm's customer base and we made solid progress in the development and expansion of our hub strategy.

(*Id.* at ¶ 76.) Neither the conference call nor the press release disclosed the bad debt practice. (*Id.* at ¶¶ 76–78.)

(10) *May 14, 2002, filing of NUI's Quarterly Form 10–Q.* The form was filed with the SEC, and signed by Kean and Abramovic. (*Id.* at ¶ 82.) Plaintiffs allege it made inadequate disclosure of the bad debt practice. (*Id.*) Also, NUI claimed on the form that there were improved margins of $600,000 at Telecom due to higher sales volume. (*Id.*)

(11) *July 12, 2002, press release.* NUI reported that its third quarter FY 2002 EPS "would be below Wall Street's consensus earnings of $0.10." (*Id.* at ¶ 88.) Instead, NUI stated it anticipated a net loss of between $0.17 and $0.20 per share. (*Id.*) NUI attributed the shortfall to "lower-than-anticipated results from energy trading in the third quarter." (*Id.*) NUI predicted that FY 2002 earnings would likely be in the range of $1.50 to $1.60 per share. (*Id.*)

(12) *July 24, 2002, press release & conference call.* NUI issued another press release and held a conference call with securities analysts. (*Id.* at ¶¶ 91–94.) NUI announced its third quarter FY 2002 earnings, reporting a loss of $0.17 per share. Kean stated in the press release:

> As 2002 continues, it is becoming evident that we have been caught in the middle of a "perfect storm." While we did not play a role in creating it, we nevertheless are forced to ride it out, which we will. The effect of weather on our distribution business, the deterioration of the energy markets and its effect on our energy trading operation, and the effect of 9/11 on the economy and on the operation of our telecom operations last fall, all are contributing to a very challenging year, to say the least. In addition, we

to certain types of transactions." 17 C.F.R. § 239.13.

are operating two businesses, energy trading and telecom, which the financial markets view with skepticism and disfavor at this time. Nevertheless, they are solid, profitable businesses for us. As our history of close to 150 years has taught us, it is dangerous to react to short-term trends. Moreover, it is the strength of our values and our focus on the basics of generating margins and earnings that has enabled NUI to weather previous storms, and that will see us through this current one.

During the past three quarters, we began to take the steps necessary to position NUI to weather the storm. Implementing a plan to strengthen our balance sheet was the starting point. We have re-evaluated all of our businesses and taken aggressive action to either eliminate or sell businesses that do not fit with our long-term strategy and will not contribute to earnings growth. The proceeds from these actions and other activities, combined with the issuance of equity in March, enabled us to reduce short-term debt levels by more than 30 percent in four months from $220 million at the end of February, to approximately $150 million at the end of June. We have also taken steps to reorganize our remaining businesses to ensure that they will continue to be active contributors to earnings as we move through this period of uncertainty. These are only a few of the steps we have taken to strengthen NUI's financial condition and improve cash flow.

The strengthening of our balance sheet has enhanced our financial flexibility and reinforced our ability to provide dividends to our shareholders, which has always been an attractive element to providing value to our investors. Ensuring that our dividend payments are supported by the results generated by some of our lower growth but predicta-ble sources of earnings and cash flow has been a key element of our financial plan. This strategy, which has been in place for several years, has enabled us to maintain a conservative dividend payout ratio as well as provide our investors with the assurance that NUI's dividend is secure.

(*Id.* at ¶ 91.) The press release also stated that operating expenses for NUI's Retail and Business Services division had increased by $3.3 million, "caused primarily by a $2.7 million increase at NUI Telecom due to the addition of two new business units in March and April 2002, respectively." (*Id.* at ¶ 92.)

Plaintiffs allege Kean and Abramovic made various false or misleading statements in the conference call. Abramovic claimed "that [NUI's] success in energy brokering was due to NUI's focus on the credit quality of its counterpartners." (*Id.* at ¶ 93.) Abramovic also said that NUI had increased operating expenses by about $2.7 million, though he did not specify the source. (*Id.* at ¶ 94.) Kean stated that "despite the lowering of 2002 EPS guidance, important progress had been made which was not reflected in NUI's numbers." (*Id.* at ¶ 93.) Kean further asserted "that NUI's trading business remained a strong contributor to earnings." (*Id.*) He also claimed that Telecom's expenses were principally due to its second quarter acquisitions' of Norcom and another company, TelCorp. (*Id.*) He stated that NUI's telecom sector "continued to achieve high growth and contribute to earnings." (*Id.* at ¶ 94.) Neither Kean nor Abramovic disclosed the bad debt practice. (*Id.*)

(13) *August 14, 2002, filing of NUI's Quarterly Form 10–Q.* The form was filed with the SEC, and signed by Kean and Abramovic. (*Id.* at ¶ 99.) Plaintiffs claim it did not adequately disclose the bad debt practice.

All thirteen statements identified by plaintiffs are alleged to have been false or misleading because of NUI's "failure to disclose that its reported financial results were materially overstated in violation of GAAP ... in that they failed to accrue for or to write off known bad debt...." (*Id.* at ¶ 51.) They are also alleged to be false or misleading because "contrary to defendants' statements, by November 8, 2001, [NUI] was experiencing an excessive level of bad debt that would have materially impaired NUI's then current earnings if it had been disclosed...." (*Id.*) Thus, plaintiffs allege all thirteen statements were false or misleading because they (1) affirmatively misstated NUI's true financial situation and (2) omitted information defendants had a duty to disclose. (*See also* ¶ 107(a) (repeating allegations of ¶ 51).)

Statements (9) through (12) are alleged further to have been false or misleading because they concealed the bad debt at Telecom, and improperly included uncollectible revenues at Telecom. (*Id.* at ¶ 74.) Thus, plaintiffs again allege these statements were false or misleading because of affirmative misstatements and omissions of information that defendants had a duty to disclose.

### ii. *Analysis*

Vague, non-specific statements of optimism about the future, so-called "puffery," are not actionable. *In re Burlington,* 114 F.3d at 1427–28. "Claims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected." *Id.* at 1427. *See also In re Advanta,* 180 F.3d at 538 (noting that puffery is not actionable because either no reasonable investor would be misled by it, or it is not material); *In Re ATI Techs.,* 216 F.Supp.2d at 433 (holding that "ATI's spin on its historical performance, as setting a 'record in revenue,' conferring a 'strong start,' and giving ATI 'market leadership,' is puf-

fery") (citations omitted); *In re Milestone Scientific Sec. Litig.,* 103 F.Supp.2d 425, 457–58 (D.N.J.2000) (finding various statements to be puffery).

We find that all of statement (5), *supra,* is mere puffery, and therefore "would not have significantly altered the mix of information deemed important to a reasonable investor in making its investment decision." *In Re ATI Techs.,* 216 F.Supp.2d at 433. NUI's statements to its shareholders made no specific representations about NUI's earnings or debt, but asserted only general claims about the past and future successes of the business. Therefore, the Second Amended Complaint will be dismissed insofar as it asserts securities fraud on the basis of these assertions.

We also find that the false and misleading nature of statement (7), *supra,* has not been pled with the particularity demanded by the PSLRA. The Second Amended Complaint alleges only that NUI filed an amendment in relation to a common stock offering, and that in it NUI discussed its "business and ... purported risk factors." (2d Am. Compl. at ¶ 67.) There is no allegation as to what was disclosed or why the disclosure was false or misleading. Therefore, the Second Amended Complaint will be dismissed insofar as it asserts securities fraud on the basis of statement (7).

Published earnings figures that are allegedly false or misleading are the types of statements actionable under Section 10(b) and Rule 10b–5. *See Shapiro,* 964 F.2d at 283. Plaintiffs have alleged that the following statements pertaining to earnings were false or misleading: statements (1) through (4), (6), and (8) through (13). Statements (1), (4), (9), and (12) publicly announced earnings for various quarters and fiscal years, all of which

statements plaintiffs allege are false or misleading because of NUI's mischaracterization of its bad debt. Statements (2), (6), (10), and (13) are filings in which NUI reported earnings to the SEC, all of which filings plaintiffs allege are false or misleading because of NUI's mischaracterization of its bad debt. Statements (3), (8), and (11) are predictions of future earnings, all of which statements plaintiffs allege are false or misleading because of NUI's mischaracterization of its bad debt. We hold that these statements satisfy the first inquiry in the securities fraud analysis, and are actionable if they were both material and made with scienter.[14] *See infra.*

We caution, however, that we do not hold that every word uttered in these eleven statements can give rise to liability. Much of the language in these press releases, conference calls, and SEC filings is puffery, and therefore not actionable. While we hold that the false or misleading nature of these statements has been adequately pled, our holding is confined to those portions of the statements that make specific representations about NUI's earnings. Thus, for example, NUI's claim in statement (1) that "our earnings per share would have been $2.15" is a well-pled false or misleading assertion, but the subsequent phrase in the same statement that "we can focus on returning to our pattern of producing superior returns for our shareholders" is puffery. It is NUI's representations concerning past and future earnings, and not the vague expressions of hope and confidence that surround many of them, that we hold to be well-pled false or misleading statements.

We therefore conclude that plaintiffs' allegations concerning statements (1)

through (4), (6), and (8) through (13), *supra,* "comply with both Rule 9(b) and PSLRA standards because they specify the allegedly misleading statements and proffer facts to support their allegations that these statements were misleading." *In re Lucent Techs., Inc. Sec. Litig.,* 217 F.Supp.2d 529, 553 (D.N.J.2002).

### c. *Materiality*

Plaintiffs claim that defendants' false or misleading statements were material because of the disparity between the reality of NUI's financial situation and the rosy picture presented to investors. (2d Am. Compl. at ¶ 107.) Specifically, plaintiffs allege that the bad debt practice caused NUI to overstate its FY 2002 earnings by at least 20%. (*Id.; see id.* at ¶ 103 (alleging that Kean stated on October 18, 2002, that roughly 20% of NUI's FY 2002 earnings shortfall was due to an increase in bad debts).) Plaintiffs' counsel explained to the Court at oral argument that even altering the earnings and bad debt numbers at Telecom to account for just the $700,000 to $750,000 in bad debt identified by Eisenberg would have decreased NUI's net income by 5%. (3–15–04 Tr. at 34.)

■ Defendants invite the Court to determine materiality based on the impact of plaintiffs' allegations on NUI's total revenues, rather than on its earnings or profits. (Def. Supp. Br. at 23.) However, defendants identify no case in this circuit where a court has analyzed materiality with reference to revenue rather than income. To the contrary, courts in the Third Circuit have looked to the impact a defendant's misrepresentations and omissions have on a corporation's net income.

---

**14.** Further, 17 C.F.R. § 210.4–01(a)(1) states: "Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccu-

rate...." Thus, the NUI SEC filings particularly alleged to be in violation of GAAP (statements (2), (6), (10), and (13)) are actionable misstatements under Rule 10b–5. *See In re Campbell Soup,* 145 F.Supp.2d at 591–92.

[E]arnings reports are among the pieces of data that investors find most relevant to their investment decisions. In deciding whether to buy or sell a security, reasonable investors often rely on estimates or projections of the underlying firm's future earnings. Information concerning the firm's current and past earnings is likely to be relevant in predicting what future earnings might be. Thus, information about a company's past and current earnings is likely to be highly "material."

*In re Burlington,* 114 F.3d at 1420 n. 9 (citations omitted). *See also In Re ATI Techs.,* 216 F.Supp.2d at 437–38 (assessing materiality with reference to earnings). Thus, we decline defendants' invitation.

■ A false or misleading statement is not automatically material, however, simply because it misstates the true condition of a company's past, present or future profits. If "the data alleged to have been omitted would have had no more than a negligible impact on a reasonable investor's prediction of the firm's future earnings, the data can be ruled immaterial as a matter of law." *In re Burlington,* 114 F.3d at 1427 (affirming dismissal of securities fraud claim where allegedly omitted information would have impacted earnings by at most 0.2%).

■ Plaintiffs claim that defendants misrepresented NUI's earnings by somewhere between 5 and 20%. At this stage of the proceedings, such allegations are sufficient to satisfy the materiality prong of a securities fraud claim. "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are unactionable as a matter of law." *Shapiro,* 964 F.2d at 280 n. 11. We hold that the alleged overstatement of

earnings by 5 to 20% is not immaterial as a matter of law.

### d. *Scienter*

### i. *NUI*

Plaintiffs allege two sets of facts they claim support a strong inference that NUI acted with scienter. First, from the beginning of the Class Period through May 2002, plaintiffs allege scienter under the "motive and opportunity" theory. Plaintiffs claim that NUI had a motive and opportunity to mislead its investors because NUI needed to keep both its share price and its reported earnings high in order to successfully consummate two transactions: a common stock offering in February 2002, and a stock-only purchase of Norcom, a telecommunications company, in mid–2002.

Plaintiffs allege that by virtue of acquisitions in 2001 of TIC Enterprises and Virginia Gas Storage Company, NUI was poorly perceived by financial analysts, and "had short-term debt of around $200 million, a level too high for a utility of its size according to industry analysts." (2d Am. Compl. at ¶¶ 16–17.) While NUI was able to reduce this debt load by $60 million in August 2001, it "knew that it needed further to reduce its short-term debt and indeed planned to do so through a common stock offering." (*Id.* at ¶ 17.) On February 1, 2002, "defendants filed a shelf registration statement with the SEC for the sale of 1.5 million shares of NUI common stock plus an over-allotment option for 275,000 additional shares." (*Id.* at ¶ 64.) NUI announced on February 27, 2002, that it was offering 1.5 million shares of common stock. (*Id.* at ¶ 71.) A March 21, 2002, press release announced that 1,725,-000 shares had been sold at $22.50 per share. (*Id.* at ¶ 72.) The aggregate proceeds of the offering were $37 million. (*Id.*)

NUI purchased Norcom in late March 2002 "for NUI common stock at a price to be determined by the average trading price for the first 20 consecutive trading days preceding the date the State of Maine gave its approval to the acquisition." (*Id.* at ¶ 73.) Plaintiffs allege that at the time of the purchase, NUI "did not know when the State of Maine's approval would come and it was imperative that [NUI] maintain the artificially inflated price of NUI common stock until such approval was granted." (*Id.*) Plaintiffs further allege that the Norcom purchase was "a material event for NUI" because, *inter alia,* it "included 4000 small and midsized business accounts within the area of services provided by Telecom." (*Id.*) The Norcom transaction was not approved by Maine until May 9, 2002. (*Id.* at ¶ 111.)

Plaintiffs allege NUI inflated the earnings of both Telecom and NUI itself to ensure the success of these two corporate transactions. (*Id.* at ¶ 21.) Specifically, plaintiffs allege that NUI, in order to artificially inflate its reported earnings, hid from the public its mischaracterization of bad debt. (*Id.*) Plaintiffs also claim NUI made the false or misleading statements identified *supra* "in order to increase artificially NUI's reported quarterly earnings, particularly in NUI's FY 2002 Second Quarter ..., when defendants could not allow any negative news to adversely impact NUI's planned common stock offering and corporate acquisitions." (*Id.* at ¶ 107(a).) Plaintiffs finally allege that "NUI needed to complete a very sizeable public offering of common stock during the Class Period at the highest possible per share price in order to generate cash to pay down its too-large debt levels," and

"[d]efendants were also motivated to misrepresent the true condition of NUI in order to use NUI's common stock as currency" to purchase Norcom. (*Id.* at ¶ 111.)

Plaintiffs' second allegation in support of an inference of scienter is that NUI had actual knowledge of the bad debt practice from either March 2002 or July 2002, through the end of the Class Period. First, plaintiffs attempt to show actual knowledge through a chain of communication from Eisenberg to NUI senior management. While he worked at Telecom, Eisenberg reported directly to Bill Mulcahy ("Mulcahy"), Senior Vice President of Telecom's Telecommunications Ventures. (*Id.* at ¶ 25.) Mulcahy in turn reported to Richard Boudria ("Boudria"), chairman and CEO of Telecom. (*Id.* at ¶¶ 24–25.) The CFO of Telecom during at least part of Eisenberg's tenure was Dave Rogers ("Rogers"). (*Id.* at ¶ 25.) Eisenberg participated in "almost daily meetings dedicated to Telecom's operations and finances," at which Mulcahy and Rogers were present. (*Id.*) Boudria, Mulcahy, and Rogers in turn had regularly scheduled meetings, at least quarterly, with NUI senior management, including Kean. (*Id.*)

Eisenberg in early March 2002 alerted Rogers, Mulcahy, and Boudria to the bad debt relating to the USTI and Asics accounts. (*Id.* at ¶ 30.) Mulcahy informed Eisenberg not to worry about Telecom "tak[ing] a hit for the bad debt," as the bad debt would be classified and reported as "billing in dispute." (*Id.*) Eisenberg is not alleged to have alerted Mulcahy, or any other Telecom manager, to the bad debt relating to the Huntington Group.[15] Plaintiffs contend that because Telecom

---

**15.** Plaintiffs conclusorily allege that "[b]y no later than March 31, 2002, Telecom senior management was aware of material bad debts owed by customers named USTI, Asics and the Huntington Group." (2d Am. Compl. at ¶ 74.) However, while there are specific alle-

gations earlier in the Second Amended Complaint that Eisenberg alerted Telecom management to the bad debt relating to the USTI and Asics accounts (*id.* at ¶ 30), there is no such specific allegation concerning the Huntington Group account.

senior management was notified of the bad debt practice, NUI was also put on notice soon thereafter by virtue of the chain of communication described above.

Plaintiffs also allege Eisenberg told NUI directly about the bad debt practice in July 2002. Eisenberg wrote two letters to NUI's associate general counsel, Mary Patricia Keefe ("Keefe"), on July 11 and July 17, 2002. (*Id.* at ¶ 33.) In these letters, Eisenberg alerted NUI of "upwards of $400,000 in losses and bad debt in this year alone" that was being "accounted for differently i.e. 'billing in dispute.'" (*Id.*) He also told Keefe that "when [he] raised the issue of the $400,000 bad debt to Mr. Mulcahy he told [Eisenberg] that it was entered on the balance sheet as a 'billing in dispute.'" (*Id.*) Eisenberg further claimed in his letters that he was "aware of bad debt being covered up at NUI Telecom." (*Id.* at ¶ 35.) Plaintiffs conclude: "Thus, by no later than July 11, 2002, ... defendants were well aware of the bad debt situation at Telecom." (*Id.* at ¶ 37.)

▇▇▇ We hold that plaintiffs' claims that NUI had motive and opportunity to mislead its investors allege particular facts sufficient to create a strong inference that, from the inception of the Class Period through May 9, 2002, NUI's false or misleading statements were made with scienter. Plaintiffs' theory of scienter is analogous to that asserted in *In re ATI Technologies.* There, plaintiffs claimed that ATI's "acquisition of a company for $453 million payable only in company stock and stock options" created a strong inference of scienter. 216 F.Supp.2d at 438. The court agreed, finding that this allegation "supplies a strong motive for artificially inflating the value of a compa-

ny stock in order to minimize dilution." *Id.* The court noted that "other courts have found stock-based acquisitions at the time of the alleged misrepresentations support a strong inference of scienter." *Id.* at 440 (citing cases). The court further observed:

> Stock sales that are unusual in scope or timing may support an inference of scienter. ATI acquired ArtX in the third quarter in an acquisition valued at $453 million. ATI announced poor expected third quarter results ... less than two months later. ATI acquired ArtX using *only* common stock and stock options as consideration. Thus, the value of the purchase was tied entirely to the price of common stock. Had defendants revealed the true state of inventory prior to the acquisition, the complaint claims that ATI would have had to issue more shares to complete the acquisition, significantly diluting the value of ATI's common stock.

*Id.* at 439–40. We therefore hold that plaintiffs have adequately pled that any statements made from the inception of the Class Period through May 9, 2002, were made with scienter (i.e., statements (1) through (4), (6), (8), and (9)).[16]

▇▇▇ We also hold that plaintiffs have alleged with sufficient particularity that NUI knew that bad debt was being improperly characterized as accounts receivable by July 11, 2002, and thus that NUI's income was being overstated. Eisenberg's letters to NUI's assistant general counsel put NUI on notice of the bad debt practice. *See In re Lucent Techs.*, 217 F.Supp.2d at 554 (holding that particular allegation that defendants had "explicit notice" of complained-of practice "estab-

---

**16.** Plaintiffs have not pled exactly when NUI's two motives arose. However, we find that NUI's alleged heavy debt load, coupled with the initiation of the common stock offering less than three months after the beginning of the Class Period, are sufficient to constitute an allegation that NUI's motive to mislead arose by November 8, 2001.

lishe[s] an inference of scienter"). Therefore, plaintiffs have adequately pled that any statements made after July 11, 2002, were made with knowledge that they were false or misleading (i.e., statements (11) through (13)).

 We do not find, however, that plaintiffs have alleged sufficient facts to create a strong inference that NUI had actual knowledge of the bad debt practice from March 2002 through July 10, 2002. Plaintiffs do not allege the date or time of the meeting at which Telecom's management allegedly informed NUI of the bad debt practice. Instead, we are invited to infer that because Eisenberg told Telecom management, and Telecom management met with NUI on at least a quarterly basis, Telecom management told NUI of the bad debt practice. Assuming *arguendo* that such an inference is reasonable, we find that it is not strong, as is required by the PSLRA.

 We have found, thus, that plaintiffs have adequately alleged scienter from November 8, 2001, through May 9, 2002, and from July 11, 2002, through October 18, 2002. This finding leaves a two-month gap,[17] during which NUI made one of the statements alleged to be false or misleading: statement (10). Because plaintiffs have not properly alleged that NUI had scienter on May 14, 2002, the day statement (10) was made, they have not adequately pled a securities fraud violation for this statement. Therefore, the motion to dismiss will be granted insofar as it pertains to statement (10).

 Where plaintiffs "have not presented merely rote conclusory allegations that the defendants knowingly did this or recklessly did that, but rather a detailed

picture of the improper practices in which Defendants knowingly engaged," scienter is adequately pled. *See In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 597 (D.N.J.2001) (quotations and citations omitted). *See also In re Lucent Techs.*, 217 F.Supp.2d at 555. We hold that plaintiffs' allegations that NUI made certain false or misleading statements with scienter are sufficiently specific to survive a motion to dismiss.

### ii. *Kean and Abramovic*

 Plaintiffs also allege actual knowledge and motive and opportunity on behalf of Kean and Abramovic. With respect to motive and opportunity, plaintiffs allege Kean and Abramovic knew a public offering was essential to NUI's future, but also realized that NUI's ability to complete the offering would be compromised if the extent of its financial problems were disclosed. (2d Am. Compl. at ¶¶ 18–19.) They further claim Kean and Abramovic hid from the public NUI's mischaracterization of bad debt as legitimate accounts receivable in order to artificially inflate NUI's reported earnings. (*Id.* at ¶ 21.) Kean and Abramovic are alleged to have done so because they "could not allow any negative news to adversely impact NUI's planned common stock offering and corporate acquisitions." (*Id.*)

Plaintiffs also allege actual knowledge. They claim "Kean ... knew or should have known the true state of affairs within NUI Telecom, as he had regularly scheduled meetings at which [NUI's] telecom operations and finances were discussed with senior NUI Telecom management." (*Id.* at ¶ 112.) They continue that "Kean was NUI's most senior officer and he either

---

**17.** This gap does not affect the Class Period. Prospective class members who purchased NUI securities between May 10, 2002, and July 10, 2002, may still have causes of action

against NUI if they relied on any of the statements made from November 8, 2001, through May 9, 2002—that is, statements (1) through (4), (6), (8), and (9).

had inside knowledge, or deliberately and recklessly disregarded such information.... Kean also controlled NUI's press releases, corporate reports, SEC filings and communications with securities analysts." (*Id.* at ¶ 130.) Plaintiffs further assert that "Abramovic ... acted as a spokesman for [NUI]. As such, [he] either had inside knowledge, or deliberately and recklessly disregarded such information.... Abramovic also controlled NUI's press releases, corporate reports, SEC filings and communications with securities analysts." (*Id.*)

We find that plaintiffs have not sufficiently pled that Kean and Abramovic acted with scienter.[18] First, plaintiffs do not adequately allege that Kean and Abramovic had motive and opportunity to commit fraud. Plaintiffs do not allege that "the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false and misleading statements and wrongful nondisclosures." *Wilson*, 195 F.Supp.2d at 633. The only motives plaintiffs have pled with any particularity, that Kean and Abramovic wanted to inflate NUI's share price and ensure the Norcom acquisition was successful, are exactly "the type of generalized motive[s] that can be imputed to the top executives of almost any publicly-owned, for-profit corporation and [are] therefore not ... sufficient motive[s] for fraud for purposes of inferring scienter." *Id.* at 634. *See also In re Rent–Way*, 209 F.Supp.2d at 515 (holding allegation that individual defendant "had a motive to commit fraud to do whatever needed to be done to increase Rent–Way's stock price and that he wanted this, in part, to fund the company's ongoing acquisition program ... does not identify a particularized, concrete benefit that could have been realized by [defendant] himself ... and is accordingly insufficient as a matter of law").

We also do not find a strong inference that Kean and Abramovic engaged in conscious or reckless behavior. There is no particular allegation that either individual defendant was ever informed of the alleged bad debt practice: the Second Amended Complaint's allegations of actual knowledge are conclusory. (*See* 2d Am. Compl. at ¶¶ 112, 130.) It is not reasonable to infer that Kean would have learned about the alleged bad debt practice by virtue of quarterly meetings with senior Telecom managers. Nor do we find it reasonable to infer that Keefe would have informed the CEO and CFO of NUI about a former employee's claim that a subsidiary was mischaracterizing $400,000 of bad debt.

We are cognizant of the Third Circuit's admonition that where, as here, plaintiffs have alleged that "[i]nformation showing that the defendants acted knowingly or with reckless disregard for the truth is within defendants' knowledge and control," (*id.* at ¶ 111), "the normally rigorous particularity rule has been relaxed somewhat." *In re Burlington*, 114 F.3d at 1418. However, in analogous circumstances, other plaintiffs surviving motions to dismiss have alleged considerably more detailed pictures of individual defendants' complicity than has been claimed here. *See, e.g.,*

---

**18.** We have found *supra* that plaintiffs have adequately alleged that NUI made certain false or misleading statements with scienter. Such allegations, however, do not satisfy plaintiffs' burden with respect to NUI's corporate officers. Rather, plaintiffs must also allege facts specifically showing that Kean and Abramovic acted with scienter in order to pursue individual claims against them. *See*

*Jones*, 274 F.Supp.2d at 646 ("A showing of scienter with respect to a company does not amount to a showing of scienter with respect to any officer or director of the company."). "Generalized imputations of knowledge do not suffice regardless of the defendant's position within the company." *In re Advanta*, 180 F.3d at 539.

*In re Honeywell Int'l Inc. Sec. Litig.*, 182 F.Supp.2d 414, 427–28 (D.N.J.2002); *In re Campbell Soup*, 145 F.Supp.2d at 598–99. Those plaintiffs have also often alleged insider trading, a powerful motive to commit fraud, which plaintiffs have not alleged here. We hold that the allegations in the Second Amended Complaint do not suffice to create even a reasonable inference, much less the strong one required by the PSLRA, that Kean and Abramovic made false or misleading statements with scienter.

### e. *Reasonable Reliance and Damages*

Plaintiffs allege that they reasonably relied on defendants' misstatements to their detriment. (2d Am. Compl. at ¶¶ 114–16.) Defendants do not claim that either reasonable reliance or damages has been improperly pled.

### f. *Safe Harbor*

■■■ 15 U.S.C. § 78u–5 provides a safe harbor from securities fraud liability for certain forward-looking statements. Subsection (c) provides:

(1) In general

Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section [19] shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity, was—

(I) made by or with the approval of an executive officers of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

(2) Oral forward-looking statements

In the case of an oral forward-looking statement ..., the requirement set forth in paragraph (1)(A) shall be deemed to be satisfied—

(A) if the oral forward-looking statement is accompanied by a cautionary statement—

(i) that the particular oral statement is a forward-looking statement; and

(ii) that the actual results might differ materially from those projected in the forward-looking statement; and

(B) if—

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is

---

**19.** Subsection (a) delineates who is protected by the safe harbor. It is undisputed that defendants fall within subsection (a).

contained in a readily available written document, or portion thereof;

(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to forward-looking statements; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

Subsection (b)(2)(A) excludes from the safe harbor any forward-looking statement that is "included in a financial statement prepared in accordance with generally accepted accounting principles."

Subsection (i)(1) defines the term "forward-looking statement" as, *inter alia,*

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC].

Plaintiffs allege that the safe harbor does not apply to any of defendants' statements. (2d Am. Compl. at ¶ 113.) Defendants claim that all of their statements are protected by the safe harbor law. We find the following with respect to the ten false or misleading statements properly alleged by plaintiffs.

Statements (1), (2), (4), (6), (9), (12), and (13) are not protected by the safe harbor provisions. All of the particularly alleged false or misleading assertions in these statements pertain to past events and earnings, and therefore are not "forward-looking" according to the definition set out in Section 78u–5(i)(1). In addition, nothing in statements (2), (6), or (13) falls within the safe harbor because those statements are all SEC filings prepared in accordance with GAAP. *See* 15 U.S.C. § 78u–5(b)(2)(A).

 Statements (3), (8), and (11) are all forward-looking because they pertain to projections of NUI's 2002 earnings-per-share. We cannot yet determine whether statement (3) is protected by the safe harbor, because the parties have not provided a transcript or other record of the conference call, and therefore it is unclear whether NUI accompanied its predictions with the cautionary language required by Section 78u–5(c). Statements (8) and (11), however, were accompanied by cautionary language, and were also specifically identified as forward-looking. (*See* Bevelock Cert., Exs. 7 & 10.)[20] Therefore, state-

---

**20.** Each statement was accompanied by the following disclaimer at the end of the press release in which EPS predictions were made: This press release contains forward-looking statements. These statements are based on management's current expectations and information currently available and are believed to be reasonable and are made in good faith. However, the forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those projected in the statements. [Describing risk factors.] For these reasons, you should not rely on these forward-looking statements when making investment decisions. The words "expect," "believe," "project," "anticipate," "intend," "should," "could," "will," and variations on such words and similar expressions, are intended to identify forward-looking statements. We do not undertake any obligation to update publicly

ments (8) and (11) are protected by the statutory safe harbor, and may not be a basis for securities fraud liability.[21]

### III. *Section 20(a) claim*

■ Plaintiffs, to state a Section 20(a) claim against Kean and Abramovic, must allege both a substantive violation and that the defendants are controlling persons. We have held, *supra*, that plaintiffs have adequately alleged a substantive violation of Section 10(b) and Rule 10b–5. Thus, the only issue is whether Kean and Abramovic are alleged to be controlling persons.

Plaintiffs allege:

By virtue of their high-level positions, participation in or awareness of [NUI's] operations and intimate knowledge of [its] finances, and their statements to the market, defendants had the power and authority to influence and control, and did influence and control, directly or indirectly, the decision-making of [NUI], including the content and dissemination of the various statements which [plaintiffs] contend[ ] are false and misleading. Defendants Kean and Abramovic … were provided with or had unlimited access to the material facts concerning NUI and its operations and financial condition and prospects, copies of [NUI's] reports, press releases, public filings and other statements alleged by plaintiff[s] to be misleading prior to or shortly after these statements were is-

sued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

(2d Am. Compl. at ¶ 136.) Plaintiffs further allege that Kean and Abramovic "had direct and supervisory involvement in the day-to-day operations of [NUI] and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same." (*Id.* at ¶ 137.)

Plaintiffs' allegations are sufficient to withstand the motion to dismiss. In *In re Rent–Way,* the court found the complaint sufficient because it

alleged that each of the individual defendants had direct and supervisory involvement in the day-to-day operations of Rent–Way by virtue of their positions, ownership rights and contractual rights, and consequently that they had the power to influence and control the particular transactions giving rise to the alleged securities violations that are the basis of this action. Each of these defendants is also alleged to have signed one or more statements filed with the SEC that were eventually restated, and to have had the ability to control the contents of these various statements.

209 F.Supp.2d at 524. Similarly, in *In re Campbell Soup,* the court found control person liability adequately stated upon the following allegations in the complaint:

---

any forward-looking statement, either as a result of new information, future events or otherwise.
(Bevelock Cert., Exs. 7 & 10.)

**21.** Plaintiffs contend that these statements should be excluded from the safe harbor because plaintiffs have pled that the statements were made with actual knowledge of their falsity. However, a business entity such as NUI can only be liable for forward-looking statements accompanied by appropriate cautionary language if the statement was "(I)

made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B)(ii). Plaintiffs have not pled the identity of the individuals who made or approved of statements (8) and (11). And, as we have held *supra*, they have not pled with particularity that any individual made or approved any of the false or misleading statements with actual knowledge of its falsity. Thus, the safe harbor protects statements (8) and (11).

Plaintiffs have alleged that Defendant Morrison, as President and CEO, and Defendant Anderson, as Vice President and CFO, "directly participated in the management of the Company, [were] directly involved in the day-to-day operations of the Company at the highest level, and [were] privy to confidential proprietary information concerning the Company and its business operations, [etc.] ... and were involved in drafting, producing, reviewing, approving, and/or disseminating" the allegedly misleading statements.

145 F.Supp.2d at 599–600 (alterations in original). We also hold that plaintiffs have adequately alleged a violation of Section 20(a).

### CONCLUSION

Plaintiffs have pled with particularity that NUI has committed a securities fraud violation in relation to the alleged bad debt practice. Plaintiffs have alleged that NUI made with scienter eight materially false or misleading statements not protected by the applicable "safe harbor" provisions. These actionable statements are (1)-(4),[22] (6), (9), (12), and (13), *supra*. Plaintiffs have also properly pled a Section 20(a) controlling person violation against Kean and Abramovic. Thus, the motion to dismiss will be denied insofar as it seeks to dismiss these claims.

The Second Amended Complaint fails to adequately plead a securities fraud violation arising out of the alleged retermination scheme. It also fails to state a claim for a securities fraud violation based on statements (5), (7), (8), (10) and (11), *supra*. And it fails to plead with particularity substantive securities fraud violations by Kean and Abramovic. Accordingly, the motion to dismiss will be granted insofar as it seeks to dismiss these claims.

**22.** Statement (3) may be within the safe harbor, but that determination must await fur-

An appropriate Order will accompany this Memorandum Opinion.

ther factual development. *See* n. 20 *supra* and accompanying text.